ILLINOIS BELL TELEPHONE COMPANY, Appellant, v. THE ILLINOIS COMMERCE COMMISSION, Appellee.—THE PEOPLE *ex rel.* OFFICE OF PUBLIC COUNSEL *et al.*, Appellants, v. ILLINOIS COMMERCE COMMISSION *et al.*, Appellees.

Second District Nos. 2—89—1228, 2489—0914, 2—89—1308, 2—89—1350, 2—90—0037, 2—90—0039, 2—90—0042, 2—90—0043, 2—90—0072 cons.

Opinion filed October 3, 1990.

John F. Ward, Jr., and Henry T. Kelly, both of O'Keefe, Ashenden, Lyons & Ward, of Chicago (Michael W. Ward, of counsel), for appellant Independent Coin Payphone Association.

Deborah Senn, of Citizens Utility Board, Douglas W. Trabaris, and Henry T. Kelly, all of Chicago, and Jean Roche, of Citizens Utility Board, of Evergreen Park, for appellant Citizens Utility Board.

Neil F. Hartigan, Attorney General, of Springfield, Arnstein & Lehr, of Barrington, Donald E. Glickman, Hilda C. Contreras, and James D. Roberts, all of Rudnick & Wolfe, Allen W. Cherry, of Legal Assistance Foundation, Sheila Macmanus, and Paul J. Maton, all of Chicago, and Andrew D. Lipman, of Swidler & Berlin, of Washington, D.C. (Robert W. Cushing and Jeff Deutschman, Assistant Attorneys General, Thomas H. Rowland, Assistant State's Attorney, and Bernard Rane, Assistant Corporation Counsel, of counsel), for appellant Public Utilities Division.

Stephen J. Moore and Karen L. Lusson, both of Office of Public Counsel, of Chicago, for appellant Office of Public Counsel.

Neil F. Hartigan, Attorney General, of Springfield (John P. Kelliher and Kathleen Nolan, Special Assistant Attorneys General, of Springfield, and Clyde Kurlander, Assistant Attorney General, of Chicago, of counsel), for appellee Illinois Commerce Commission.

Neil F. Hartigan, Attorney General, of Springfield (Karen L. Lusson, Stephen J. Moore, and Ana C. Cusack, Special Assistant Attorney General, of Chicago, of counsel), for the People.

Louise A. Sunderland, John C. Gockley, Richard N. Janney, and Lincoln V. Janus, all of Illinois Bell Telephone Company, of Chicago (Edward A. Butts, of counsel), for Illinois Bell Telephone Company.

JUSTICE REINHARD delivered the opinion of the court:

These consolidated appeals are taken from an order of the Illinois Commerce Commission (the Commission) issued in response to rate sheets filed by Illinois Bell Telephone Company (Bell) seeking the adoption of new and restructured telephone rates. The order adopted

a new rate schedule incorporating a usage sensitive service (USS) pricing structure and a modified regulatory plan (MRP). The Commission denied all motions for rehearing.

The nine appellants before this court are: Bell, which is also an appellee in seven of the eight appeals brought by the other appellants; the Citizen's Utility Board (CUB); the City of Chicago; Community Action for Fair Utility Practice; the People of the State of Illinois *ex rel.* the Office of Public Counsel (OPC); the People of the State of Illinois *ex rel.* Attorney General Neil Hartigan; the People of Cook County; MCI Telecommunications Corporation; and the Independent Coin Payphone Association. All of the appellants except Bell are hereinafter referred to as the intervenors as that was their status in the proceeding below. OPC's appeal was originally filed in the Fourth District of the Appellate Court but was transferred to this court. The Commission is an appellee in each separate appeal.

The intervenors collectively raise nine issues on appeal: (1) whether the Commission failed to meet its statutory duty to set reasonable rates; (2) whether the Commission had the authority to adopt the MRP as part of its rate-setting process; (3) whether the refund mechanism of the MRP constitutes retroactive ratemaking; (4) whether the Commission's order was supported by substantial evidence; (5) whether the Commission violated its own rules by adopting a two-year rate plan based on data from a single test year; (6) whether the Commission erred by allowing Bell to recover certain operating expenses; (7) whether the Commission violated the intervenors' due process rights by accepting data from Bell after the close of evidence; (8) whether the Commission's reliance on Bell's cost-of-service studies improperly allowed for cross-subsidization of services; and (9) whether the Commission's decision to allow an expansion of USS was improper and not supported by substantial evidence.

In its appeal from the Commission's order, Bell raises three issues: (1) whether the Commission's finding of the proper rate of return Bell should be allowed to earn was supported by substantial evidence; (2) whether the Commission improperly delegated its responsibility to determine the rate at which Bell's equipment should be depreciated; and (3) whether the Commission's decision to disallow recovery of certain operating expenses was supported by substantial evidence.

This case commenced on December 13, 1988, when Bell filed new rate sheets with the Commission. Bell's proposal to the Commission can be divided into three main elements. First, Bell proposed the adoption of a new rate schedule along with suggested deviations from

the traditional manner in which the Commission sets rates. Second, Bell presented certain revenue and expense information to the Commission as a part of the test-year analysis utilized in setting rates. Third, Bell proposed the adoption of USS in the portion of its service area designated the Greater Illinois Area (GIA).

■ Section 9—101 of the Public Utilities Act requires the Commission to determine that the rates charged for public utility services are "just and reasonable." (Ill. Rev. Stat. 1989, ch. 111⅔, par. 9—101.) The fundamental purpose of providing a particular rate schedule is to generate a rate of return which the Commission determines is just and reasonable and which will enable the utility to continue operation at an acceptable level of operating income. (*Cerro Copper Products v. Illinois Commerce Comm'n* (1980), 83 Ill. 2d 364, 371, 415 N.E.2d 344, 349.) The traditional method of setting rates in this manner begins with the threshold determination of what constitutes a reasonable return on equity (ROE) for the utility; rates are then set at levels designed to produce the target ROE. The parties also refer to this traditional approach as the "pick-a-point" method.

Bell's proposal differed from the traditional approach in that it asked the Commission to select a range of acceptable ROE instead of a single target ROE. Under Bell's proposal, which was to be effective through 1991, rates would be set to achieve a target 14% ROE. As part of its proposal, Bell designated certain core (noncompetitive) and noncore (more competitive) services. Bell would agree to forgo filing for any additional tariffs on designated core services so long as its earnings during the period in question did not fall below a designated "baseline" of 13% ROE.

The central novelty of Bell's proposal was the portion designated the "Incentive Plan," which dealt with the disposition of any earnings in excess of the target ROE. Revenues between 14% and 15% ROE would accrue to Bell. However, for those revenues exceeding the threshold 15% ROE, Bell would keep half of the excess revenue and refund the rest to the ratepayers by way of a yearly refund.

Fred Konrad, Bell's assistant vice-president-regulatory, presented Bell's plan to the hearing examiners assigned by the Commission. Konrad noted the existence of increased competition in the telecommunications industry during the last 20 years and stated that the industry would be predominantly competitive in the long run. In Konrad's view, the increase in competition requires a move toward different regulatory techniques. Such techniques should protect consumers of monopolistic telecommunications services via direct price regulation while providing increased flexibility in the regulation of

more competitive services. Konrad testified that Bell's Incentive Plan met these objectives in two regards. First, because Bell would voluntarily undertake not to file for an increase in rates for core services as long as its ROE remained above 13%, price stability in noncompetitive markets would be promoted. Second, the earnings-sharing feature of Bell's proposal would allow the utility to reap the benefits of additional earnings produced as a result of Bell's increases in efficiency, so long as Bell shares these earnings with ratepayers.

Dr. Marvin H. Kahn, an economist, examined Bell's proposed Incentive Plan on behalf of CUB. Kahn questioned whether the Incentive Plan would lead Bell to make improvements in efficiency which would result in benefits for ratepayers. Kahn stated that virtually all of Bell's markets are currently noncompetitive and would remain so over the next 10 years. Because he felt that the Incentive Plan failed to give Bell and ratepayers equal treatment, Kahn recommended that the plan be rejected.

W. Page Montgomery, vice-president of Economics and Technology, Inc., testified on behalf of Cook County that Bell has access to superior forecasting data which would enable it to control the outcome of the Incentive Plan. In addition, Montgomery stated that Bell had not demonstrated the increase in competition, either presently or in the future, which Bell gave as the justification for the Incentive Plan. Montgomery recommended that an alternative regulatory plan be adopted in place of Bell's proposal. Montgomery proposed adoption of an "incentive rate ratchet" with targeted rates subject to programmed reductions in the out years of the plan.

Madelon A. Kuchera, the director of the telecommunications program of the Commission's Policy and Analysis Research Division (PAR), appeared on behalf of Commission staff. Kuchera explained traditional ROE price setting, and she also discussed newer alternative regulatory methods which attempt to address the increase in competition which has undercut the effectiveness of traditional ROE regulation. Kuchera stated that direct price controls or price caps are the best form of utility regulation, but she indicated that an incentive-based plan such as Bell's might constitute an acceptable interim step toward direct price regulation. Kuchera put forth nine criteria for evaluating an alternative regulatory plan: (1) high subscribership; (2) protection of captive customers; (3) high quality; (4) network integrity; (5) minimization of cross-subsidies and arbitrary recovery of costs; (6) efficient production of telecommunications services; (7) flexible pricing of telecommunications services; (8) maximization of telecommunications supply; and (9) minimization of regulatory costs.

Alex J. Harris, an analyst in the telecommunications program of the Commission's PAR Division, also testified before the Commission and addressed Bell's proposal more specifically than did Kuchera. Harris felt that Bell's Incentive Plan suffered from three main deficiencies: (1) the plan inadequately protects captive customers; (2) there are insufficient incentives to increase efficiency, and Bell might be prompted to request increases in the rates for certain designated noncore services with the least elastic demand; and (3) the plan does not ease the cost or complexity of regulation. Harris proposed the following modifications to the Incentive Plan to make it acceptable: (1) a first-year reconciliation to correct forecasting errors; (2) elimination of the baseline ROE mechanism to increase Bell's risk factor; (3) inclusion of an upper limit on Bell's earnings to prevent excess; (4) designation of service baskets and subbaskets in place of Bell's core/noncore designations; (5) adoption of rate caps and bands; and (6) a productivity driver applicable to the noncompetitive basket of services. Harris opined that the plan as modified would satisfactorily meet Kuchera's nine regulatory objectives.

Several witnesses testified regarding the appropriate ROE to which the Commission should target rates. Scott Rungren, a financial analyst with the Commission, recommended an ROE of between 12.50% and 13.70%. Rungren recommended that rates be set to achieve the 13.10% midpoint if the Commission did not adopt an incentive plan. Several of Bell's witnesses recommended a higher ROE range and target, due in part to the incorporation in their analyses of an upward adjustment for market-return expectations.

Evidence was also presented regarding the propriety of Bell's cost-of-service studies. The cost studies were presented by Bell as a mechanism to demonstrate that the price of Bell's services were set above their cost, indicating the absence of improper cross-subsidization of competitive services by noncompetitive services. Bell vice-president Konrad testified that Bell's cost studies, which it called long-run marginal cost (LRMC) studies, allocated many common costs but did not allocate the cost of common overhead. Common overhead costs, which constituted more than 20% of Bell's 1987 operating expenses, include executive salaries, personnel administration, legal services, and taxes common to both competitive and noncompetitive services. Konrad testified that allocation of common overhead was not undertaken in Bell's cost studies because any such allocation would be "arbitrary."

M. Barry Payne, an economist in the financial monitoring section of the Commission's Public Utilities Division, testified on behalf of

Commission staff. Payne testified that Bell's cost studies were biased and incomplete, and he specifically noted the failure of Bell's cost studies to allocate common overhead costs. Payne and CUB witness Marvin Kahn favored the use of a stand-alone cost study rather than a LRMC study for use in setting prices. A stand-alone cost study is a category cost-of-service study which identifies the cost of a company's major service categories on an independent basis in an attempt to avoid distortions caused by economies of scope (the economic benefit of multiple services emanating from common resources). Payne conceded that the stand-alone cost methodology was "highly controversial" and that he knew of no State regulatory commission actually applying such a cost method.

Staff witness Harris testified that LRMC methodology, while "imperfect," is an "appropriate, useable, and informative measure against which to gauge prices for competitive services, so as to guard against cross-subsidies." The record contains copies of two letters sent by the Commission to Bell requesting the computation of a rate structure utilizing certain variables supplied by the Commission. The hearing examiners made it known earlier in the proceeding that they expected to ask Bell to run these rate computations on its computers sometime between the filing of briefs and the entry of the final order.

After evaluating the evidence presented, the hearing examiners issued a proposed order. The hearing examiners concluded that Bell failed to establish a sufficient basis for the adoption of an alternative regulatory plan and proposed that rates should be set under traditional methodology to achieve a target ROE of 13%. The hearing examiners concluded that Bell's cost studies were not LRMC studies and that they did not properly account for "economies of scope that arise from Illinois Bell's provisioning of multiple services out of the same facilities." The hearing examiners stated that the allocation of costs between competitive and noncompetitive services was "crucial" to insure that there was no cross-subsidization of competitive services. The hearing examiners recommended that the Commission not adopt a new rate structure incorporating USS because Bell had failed to supply sufficiently accurate cost studies to demonstrate that no cross-subsidization would occur.

In its order, the Commission decided, with one commissioner dissenting, that it had the authority to adopt a modified regulatory structure as part of the ratemaking proceedings. The Commission determined that "a modified regulatory framework is an appropriate first step" toward an approach more suited to an increasingly competitive telecommunications market. Rejecting the alternatives offered by

the various parties, the Commission adopted its own "modified regulatory plan" (MRP). The Commission began by noting Rungren's recommendation that the ROE should be set at 13.10%. The Commission then determined that, because the MRP would allow Bell "to earn rates of return (with sharing) in excess of the [MRP]'s target rate of return on equity," the ROE target should be set lower, at 12.76%. Rates were to be fixed to produce earnings at this level.

The Commission further determined that there was a *range* of ROE which would produce reasonable earnings and, therefore, reasonable rates. The Commission found this range to be between the target 12.76% ROE and a ceiling of 13.79% ROE. Since 13.79% ROE represented the top of the Commission's chosen range of reasonable returns, the Commission determined that Bell must refund to ratepayers *all* of its earnings in excess of 13.79% ROE. For the portion of earnings within the acceptable range, however, the Commission adopted an earnings-sharing scheme whereby Bell was to share the excess earnings with ratepayers via a yearly refund according to the following formula:

| ROE LEVEL OF EARNINGS | REFUNDED TO RATEPAYERS | RETAINED BY BELL |
|---|---|---|
| 12.76 — 14.00% | 40% | 60% |
| 14.00 — 15.00% | 70% | 30% |
| over 15.00% | 100% | 0% |

As noted above, 13.79% ROE was to be the absolute cap or ceiling on Bell's earnings. Although the formula accounts for the sharing of earnings up to 15% ROE, the fact that the portion of these earnings which Bell retains is discounted by a percentage indicates that Bell's earnings after the refund process were not to exceed 13.79% ROE. The Commission refers to the after-refund earnings as the *effective* ROE.

The Commission's order referred to the MRP as a "two year plan," although it appears that the Commission could avail itself of traditional procedures to increase or decrease rates during this period and thereby modify or depart from the MRP. The Commission did not accept Bell's core/noncore designation, but it noted that it expected Bell to honor its commitment not to seek any rate increase for core services over the two-year life of the MRP. The Commission noted that Kuchera's nine-point criteria "can serve as the basis for monitoring the plan approved in this order."

With regard to the expansion of USS into the GIA, the Commission found that Bell's cost-of-service studies "are reasonable and produce valid results for the purpose of this case." In so finding, the

Commission noted that Bell's methodology had been "used in numerous past rate cases" and had been accepted by the Commission before. Recognizing the need to reassess cost-of-service methodology, however, the Commission called for continued study in this area. The Commission rejected the stand-alone cost study method because it was "untried for use in setting rates," and the Commission stated that "Staff or the Intervenors must make a more compelling showing to justify a departure from past policies." The Commission accepted Bell's proposal to expand USS into the GIA.

█ Bell and the intervenors now appeal from the Commission's order. In reviewing an order issued by the Commission, a court should reverse the order, in whole or in part, if it finds that: (1) the Commission's findings are not supported by substantial evidence in the record; (2) the Commission acted beyond its authority; (3) the order violates a State or Federal statute or constitution; or (4) the proceedings were in violation of the State or Federal constitution or laws to the prejudice of the appellant. (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 10—201.) Substantial evidence has been defined as evidence which a reasoning mind would accept as sufficient to support a particular conclusion and consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. (*Metro Utility v. Illinois Commerce Comm'n* (1990), 193 Ill. App. 3d 178, 184, 549 N.E.2d 1327, 1330-31.) On review, the Commission's findings and conclusions on a question of fact are considered *prima facie* true, and its rules, regulations and orders are considered *prima facie* reasonable. The burden of proof on appeal rests with the party appealing. (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 10—201(d).) The Commission's interpretation of a question of law, however, is not binding on a reviewing court. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 204, 555 N.E.2d 693, 698.

█ The first argument raised by the intervenors on appeal is that the Commission violated its statutory duty to set reasonable rates by adopting a range of ROE instead of employing the traditional "pick-a-point" methodology. The Commission defends the notion of a reasonable range of earnings by noting the words of the United States Supreme Court:

> "Statutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high. To reduce the abstract concept of reasonableness to concrete expression in dollars and cents is the function of the Commission." (*Montana-Dakota Utilities*

*Co. v. Northwestern Public Service Co.* (1951), 341 U.S. 246, 251, 95 L. Ed. 912, 919, 71 S. Ct. 692, 695.)

Additionally, the Commission contends that, for purposes of setting a rate schedule, it employed traditional pick-a-point methodology because rates were set to achieve the target ROE of 12.75%.

We agree with the Commission in this regard. The rate schedule adopted did not in any way relate to the range of ROE which the Commission determined to be reasonable. The rate schedule was set to achieve the target ROE just as would have been the case under traditional pick-a-point methodology. The range of reasonable ROE was established only as a foundation for the earnings-sharing provisions of the MRP. Our inquiry, then, must focus on the MRP's earnings-sharing provisions and on the specific question of whether this portion of the plan is permissible under the Public Utilities Act (Act).

The Commission contends that its authority for adoption of the earnings-sharing plan stems from its broad and well-established discretion in selecting the means utilized in meeting its statutory obligation to set utility rates. In support of this proposition, which Bell advances as well, the Commission places great reliance on the Illinois Supreme Court's decision in *City of Chicago v. Illinois Commerce Comm'n* (1958), 13 Ill. 2d 607, 150 N.E.2d 776. At issue in *City of Chicago* was the Commission's adoption of a rate formula which included an automatic adjustment clause pegged to the price of natural gas. (13 Ill. 2d at 609, 150 N.E.2d at 777.) Though there was no statutory authority for such an adjustment clause, our supreme court held that it was within the Commission's power, stating as follows:

> "[T]he statutory authority to approve rate schedules embraces more than the authority to approve rates fixed in terms of dollars and cents. The present automatic adjustment clause is a set formula by which the price of natural gas to the ultimate consumer is fixed by inserting in the formula the wholesale price of natural gas ***. The Public Utilities Act, taken as a whole, contemplates that a rate schedule may contain provisions which will affect the dollar-and-cents cost of the product sold." (*City of Chicago*, 13 Ill. 2d at 611, 150 N.E.2d at 778.)

The Commission notes that this decision was issued before the Commission was given specific statutory authority to adopt a natural gas adjustment. (See Ill. Rev. Stat. 1989, ch. 111⅔, par. 9—220 (eff. Jan. 1, 1986).) The Commission argues that the MRP, like the rate-adjustment provision at issue in *City of Chicago*, represents a permissible means which may be employed toward the end of setting rates.

The Commission's reliance on its ratemaking authority in this in-

stance, however, begs the question of whether the refund provisions of the MRP constitute *retroactive* ratemaking. The intervenors posit this issue as their second argument in opposition to the MRP.

■ Retroactive ratemaking is prohibited under the Act; that is, the Act prohibits refunds when rates are too high and surcharges when rates are too low. (*Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 207, 529 N.E.2d 510, 516.) The rule against retroactive ratemaking was announced in *Mandel Brothers, Inc. v. Chicago Tunnel Terminal Co.* (1954), 2 Ill. 2d 205, 117 N.E.2d 774, where the court held that the act of setting rates is "legislative in character and prospective in its operation." (2 Ill. 2d at 210, 117 N.E.2d at 776.) More recently, the court elaborated on the rationale underlying the rule:

> "The prohibition of retroactive ratemaking is derived from the overall scheme of the Act and the role of the Commission in the ratemaking process. *** The rule prohibiting retroactive ratemaking is consistent with the prospective nature of legislative activity, such as that performed by the Commission in setting rates. Moreover, because the rule prohibits refunds when rates are too high and surcharges when rates are too low, it serves to introduce stability in the ratemaking process." *Citizens Utilities Co.*, 124 Ill. 2d at 207, 529 N.E.2d at 515-16.

In *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 555 N.E.2d 693 (hereinafter referred to as *BPI*), the Illinois Supreme Court struck down a rate plan adopted by the Commission which utilized a refund mechanism to adjust the earnings of Commonwealth Edison. (*BPI*, 136 Ill. 2d 192, 555 N.E.2d 693.) The Commission's order, which it construed to be a decision issued on the merits, set out a five-year rate plan containing: a first-year rate increase, which the Commission adjudged reasonable; a second-year increase, the reasonableness of which the Commission would address at a later date; and a rate moratorium which would be in effect during the final three years. At the end of each of the plan's five years, the Commission was to review the utility's earnings to determine if they were "excessive." If so, any excess earnings would be refunded to ratepayers the following year. *BPI*, 136 Ill. 2d at 205, 555 N.E.2d at 698.

The Illinois Supreme Court determined that the plan was beyond the Commission's authority. Although the Commission's order was purportedly an adjudication on the merits, the court held that the order was, in fact, a settlement which was illegal because not all parties had agreed to it. (*BPI*, 136 Ill. 2d at 218, 555 N.E.2d at 705.) In de-

termining that the order was actually a settlement, the court noted that it "contained two provisions the Commission did not have authority to unilaterally impose—retroactive refunds and a rate moratorium." (*BPI*, 136 Ill. 2d at 213, 555 N.E.2d at 702.) The court further stated, however, that "even if the [Commission's order] is not a settlement, but a decision on the merits, it is still invalid because (1) the Commission did not have statutory authority to enter two of the provisions, and (2) the [Commission's order] was not independently supported by the evidence in the record." (*BPI*, 136 Ill. 2d at 217, 555 N.E.2d at 704.) The court's opinion makes it clear that the two unauthorized provisions referred to were those providing for a refund mechanism and a rate moratorium.

■ We believe that the supreme court's decision in *BPI* effectively equates refund mechanisms such as the one at issue here with the prohibited practice of retroactive ratemaking. Although the MRP does not contemplate that Bell would ever retain any earnings in excess of the 13.79% ROE ceiling, it is clear that the MRP requires Bell to refund to ratepayers earnings which are in excess of the amount which the Commission has determined that Bell should earn. This is tantamount to a determination that the rates which produced these earnings are too high, but the rule against retroactive ratemaking as set forth in *BPI* prohibits the use of refunds to retroactively reduce rates which are too high. Thus, the refund mechanism of the MRP constitutes impermissible retroactive ratemaking.

The Commission argues that, unlike the plan at issue in *BPI*, the MRP's refund mechanism is part of a prospectively articulated rate-setting design. Thus, the Commission argues, the MRP more closely resembles the "set formula" for rates upheld in *City of Chicago*. We disagree. Although the "set formula" in *City of Chicago* was subject to changes due to the adjustment clause pegged to the price of natural gas, the rates set pursuant to the formula were to have only prospective application. There was no utilization of refunds. See *City of Chicago*, 13 Ill. 2d at 609, 150 N.E.2d at 777.

■ Bell argues that, because only *it* must pay the refunds, then only *it* can raise the issue of whether the Commission's refund mechanism constitutes impermissible retroactive ratemaking. In essence, Bell contends that only it has standing to raise this issue. Bell correctly notes that only the utility can assert a claim that its managerial prerogative has been invaded by the Commission. (*Produce Terminal Corp. v. Illinois Commerce Comm'n* (1953), 414 Ill. 582, 599, 112 N.E.2d 141.) The propriety of the refund mechanism, however, goes beyond mere managerial prerogative. Although Bell concedes that the

intervenors may participate in the process of determining the proper amount of refunds due under the MRP, Bell fails to realize that the intervenors also have an interest in determining whether the refund process itself is a viable mechanism. As the supreme court stated in *BPI*, although the refund mechanism may, "on [its] face, benefit the intervenors," the adoption of this approach involves "exceptions and contingencies which may adversely affect the intervenors." (*BPI*, 136 Ill. 2d at 230, 555 N.E.2d at 710.) While this statement was made in the context of a settlement agreement between the Commission and the utility only, it nonetheless illustrates that the intervenors' right to contest the refund mechanism is not negated merely because they may in some way benefit from it.

■ Bell and the Commission argue that the MRP does not affect rates *per se* because it sets a fixed schedule of rates, and only the dollar amount ultimately paid by ratepayers is affected by the year-end refund. We find this distinction to be illusory. The Act's definition of "rate" includes not just the prices charged for services, but also "any rule, regulation, charge, practice or contract relating thereto." (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 3—116.) This definition is broad enough to include refunds which affect the ultimate price paid by ratepayers.

Finally, Bell and the Commission argue that, even though the MRP's refunds would have retroactive effect, this does not constitute retroactive ratemaking because the MRP is intended to foster goals beyond the mere setting of rates, such as promoting increased efficiency. This argument, however, proves too much. The Commission cannot invoke its ratemaking powers as the authority supporting its adoption of the MRP and at the same time argue that the MRP's retroactive refunds do not constitute ratemaking. Aside from its ratemaking authority, the Commission identifies no authority supporting its adoption of the MRP's earnings-sharing provisions. In fact, examination of the Act compels a contrary conclusion.

Section 9—244 of the Act reads as follows:

"9—244. Incentives to improve utility performance—Study

§9—244. The Commission may *study* the necessity for, and desirability of, implementing regulatory mechanisms which reward or penalize utilities through the adjustment of rates based on utility performance compared to established standards for specific managerial and operational functions. Any such study shall consider the consistency of such mechanisms with the existing obligation of utilities to provide least-cost service and traditional ratemaking principles. *** Any such study *** shall be

subject to hearing and comment, and *any findings shall be reported to the General Assembly, with appropriate legislative recommendations.*" (Emphasis added.) Ill. Rev. Stat. 1989, ch. 111⅔, par. 9—244 (eff. Jan. 1, 1986).

The intervenors argue that this legislative directive to *study* incentive-based regulation impliedly disallows the Commission to implement directly such techniques. We agree.

The Commission is a creature of the legislature deriving its power and authority solely from the statute creating it, and its acts or orders which are beyond the purview of the statute are void. (*Illinois Power Co. v. Illinois Commerce Comm'n* (1986), 111 Ill. 2d 505, 510, 490 N.E.2d 1255, 1257.) The fact that no statute precludes an agency from taking a particular action does not mean that the authority to do so has been given by the legislature. (See *Schalz v. McHenry County Sheriff's Department Merit Comm'n* (1986), 113 Ill. 2d 198, 205, 497 N.E.2d 731, 734.) Here, the legislature has directed the Commission to study incentive-based regulation and to report its findings. As a matter of statutory construction, the expression of one thing in an enactment excludes any other, even if there are no negative words prohibiting it. (*City Savings Association v. International Guaranty & Insurance Co.* (1959), 17 Ill. 2d 609, 612, 162 N.E.2d 345.) This maxim leads to the conclusion that, by authorizing only the *study* of incentive-based regulation, the legislature did not intend that the Commission should undertake experimentation on its own.

Bell and the Commission argue that the MRP does not reflect the same type of incentive-based plan to which section 9—244 is directed. They note that section 9—244 speaks of plans "which reward or penalize utilities through the adjustment of rates based on utility performance compared to established standards for specific managerial and operational functions." (Ill. Rev. Stat. 1989, ch. 111⅔, par. 9—244.) Bell and the Commission argue that the MRP is not such a plan because: (1) it does not allow for the "adjustment of rates," but only for refunds; and (2) it does not establish managerial or operational standards against which to judge Bell's performance.

Once again, these distinctions are illusory. The characteristics of the MRP appear to be virtually, if not identically, the same as those which section 9—244 directed to be studied. Though the MRP does not allow for a prospective adjustment of rates, it does allow the refund mechanism to reduce retroactively the dollar amount paid by ratepayers for telephone service. Although it adopts no formal performance criteria, the order establishing the MRP cited staff witness Kuchera's nine-point criteria for evaluating an alternative regulatory

plan as the "basis for monitoring the plan." Moreover, though they now both generally avoid use of the word "incentive," neither Bell nor the Commission disputes that at least one central purpose of the plan was to serve as an incentive for greater efficiency.

Furthermore, the legislature has already enacted a comprehensive regulatory framework within which the Commission may address increased competition in the telecommunications industry. Article XIII of the Act was enacted as the Universal Telephone Service Protection Law of 1985 (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 13—100 *et seq.*). Article XIII is premised on the legislature's finding that increased competitiveness in the telecommunications industry necessitates revision of the State's regulatory policies and practices. (Ill. Rev. Stat. 1989, ch. 111²/₃, pars. 13—102(b), (c).) Article XIII provides for the classification of telecommunications services as either competitive or noncompetitive (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 13—502) and provides for flexibility in the pricing of competitive services (see Ill. Rev. Stat. 1989, ch. 111²/₃, par. 13—506 (allowing rates to be set as a "range, band, formula or standard within or by which a change in rates or charges for such telecommunications service could be made without prior notice or prior Commission approval")). The fact that the legislature has provided article XIII as a flexible regulatory tool makes it less likely that the legislature intended that the Commission should undertake its own experimentation in this regard without prior and specific legislative approval.

We conclude, therefore, that the Commission's ratemaking authority does not extend to adoption of an earnings-sharing scheme incorporating retroactive refunds and that the Act does not otherwise authorize the Commission to adopt such a plan.

■ The Commission argues that, even if we find that the Commission was without authority to adopt the MRP, we may still affirm that portion of the order setting rates to achieve a target ROE of 12.76% under traditional ratemaking procedures. We note, however, that the Commission's order stated that the target ROE would have been set at a level higher than 12.76% if the rate of return finding were not made within the framework of the MRP. The 12.76% ROE target was thus inextricable from the MRP which we have rejected as illegal, and so we must reverse the Commission's rate of return finding as well. As a result, there is no need for us to examine the propriety of the cost and pricing structure, including USS, adopted to produce earnings at 12.76% ROE. The test-year expense issue likewise need not be addressed at this juncture because the Commission's proceedings on remand may well be undertaken with reference to data

from a different and updated test-year period. Thus, our reversal of the MRP and rate of return findings makes it necessary to reverse the order *in toto.*

We anticipate, however, that three issues raised in these appeals, each more legal than factual, may be addressed in proceedings on remand. To assist the Commission in this regard, we proceed to address briefly these three issues now.

■■ First, we note the Commission's rate plan clearly contemplated that it would be in effect for two years, but the plan was undertaken with reliance on data from only a single test year. In *BPI,* the supreme court noted the Commission's past practice has been to set rates on a year-to-year basis utilizing a one-year test period, and the court expressed disapproval of a five-year rate plan based on data from only one test year. *(BPI,* 136 Ill. 2d ¬t 225-26, 555 N.E.2d at 708.) The court noted that the Commission could have, but did not, enact "a new rule *** to establish a new test year or test period for cases which would set rates for more than one year." *(BPI,* 136 Ill. 2d at 226, 555 N.E.2d at 708.) Here, too, the Commission failed to establish a test-period procedure which all parties could follow in a proceeding implementing a multiple-year rate plan. It remains true that the Commission has "not set a clearly identifiable alternative standard on which future cases would be based." *(BPI,* 136 Ill. 2d at 227, 555 N.E.2d at 709.) We trust this shall not be the case in any similar future proceeding.

■■ Second, the intervenors argue that the Commission violated their right to due process by accepting data from Bell after the close of evidence. The Commission responds that this information was not truly evidence but merely mathematical calculations run on Bell's computers. Counsel for the Commission stated in oral argument that the reception of such numerical data is a common practice in proceedings before it. If this is, in fact, the case, we wish to express our view that the Commission should incorporate this "common practice" into its rules of practice so that courts of review might be better able to assess the validity of such a procedure on more than a case-specific basis.

■■ Third, the intervenors argue that Bell's cost-of-service studies, on which the Commission relied in adopting a price structure in the instant case, fail to guard against improper cross-subsidization of competitive services by noncompetitive services. The cost-of-service studies are utilized to insure that the price of competitive services is set at or above their cost which, in turn, indicates that the competitive services are not being cross-subsidized by noncompetitive ser-

vices. Article XIII of the Act expressly forbids cross-subsidization:

"§13—507. In permitting, approving, investigating or establishing rates, charges, classifications or tariffs for noncompetitive services offered or provided by a telecommunications carrier which also offers or provides competitive services, the Commission *shall not* allow *any* subsidy of competitive services by noncompetitive services. In the event that facilities are utilized or expenses are incurred for the provision of both competitive and noncompetitive services, the Commission shall allow or establish rates or charges for the noncompetitive services which reflect *only that portion* of such facilities or expenses which it finds to be proper and reasonable. \*\*\*

For the purposes of this Section, the Commission *shall not* allocate to *any* competitive service *all* or *part* of the value of investment in facilities utilized, or expenses incurred, in connection with providing noncompetitive service." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 111⅔, par. 13—507.)

The Act also references LRMC studies as a possible mode of analysis for the Commission to utilize in addressing this issue. See Ill. Rev. Stat. 1989, ch. 111⅔, pars. 13—502(c), 13—507.

The intervenors contend that Bell's cost studies do not adequately assess the cost of competitive services because no portion of the cost of common overhead is allocated to competitive services. Bell states that it did not apportion common overhead costs between competitive and noncompetitive services because to do so would be "arbitrary." By apportioning 0% of common overhead to the cost of competitive services, however, Bell has itself made an arbitrary apportionment. The statute could not more clearly require that some apportionment of common costs be made, and the Commission has improperly acquiesced in Bell's outright failure to do so.

Bell argues that common overhead is not apportionable and that it is a residual cost which will ultimately be paid out of Bell's revenues without apportionment to either competitive or noncompetitive services. The issue here, however, is not simply whether the costs are paid; the issue is whether the *price* of competitive services sufficiently covers their *cost*. Without a full assessment of costs, including common overhead costs, it is impossible to make this determination. Thus, even though Bell may feel that apportionment of common overhead is arbitrary, it would be arbitrary and *illegal* for the Commission to fail to make *some* apportionment of common overhead to competitive services when assessing the proper price of such services.

We do not find persuasive Bell's argument that its studies are

proper because they are LRMC studies, the use of which is specifically contemplated by article XIII. Bell argues that common overhead is a fixed cost which, by definition, is excluded from LRMC studies. While we agree that the Act specifically allows for the use of LRMC studies to guard against cross-subsidization, we do not agree that common overhead cannot or should not be apportioned within such studies. Though the Act does not define LRMC, the Commission cannot be allowed to adopt a definition which conflicts with the Act's specific directive that common expenses be apportioned between competitive and noncompetitive services.

Deference to the Commission's findings is especially appropriate in questions involving the assessment of complex technological and scientific data. (*Village of Apple River v. Illinois Commerce Comm'n* (1960), 18 Ill. 2d 518, 523, 165 N.E.2d 329.) Here, for example, it was within the Commission's discretion to reject the controversial stand-alone cost methodology advanced by the intervenors. We trust that, in the future, the Commission will be able to arrive at a cost methodology, whether LRMC, stand-alone or some other, which makes an apportionment of the cost of common expenses, including common overhead. By accepting Bell's outright failure to attempt even to apportion common overhead in the instant case, however, the Commission has failed to make a finding of what "reasonable and proper" portion of common expenses should be ascribed to noncompetitive services as required by section 13—507 of the Act.

We conclude that the Commission was without authority to adopt the MRP, and so we reverse the order implementing the plan. Because the Commission's rate of return finding was inextricably linked to the MRP structure, the rate of return finding, as well as the Commission's findings in regard to the expense and pricing issues, must also be reversed. The Commission's order is, then, reversed *in toto.*

The order of the Illinois Commerce Commission is reversed, and the cause is remanded to the Commission.

Reversed and remanded.

INGLIS and McLAREN, JJ., concur.