THE PEOPLE *ex rel.* JACK O'MALLEY *et al.*, Petitioners-Appellants, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.

Second District  Nos. 2—91—1421, 2—91—1459, 2—92—0007, 2—92—0014, 2—92—0032, 2—92—0059, 2—92—0060, 2—92—0061 cons.

Opinion filed January 6, 1993.

Jack O'Malley, State's Attorney, of Chicago (Thomas H. Rowland, Robert K. Lock, Judith A. Mondello, and Marie D. Spicuzza, Assistant State's Attorneys, and Robert W. Cushing, Assistant Attorney General, of counsel), for petitioner People of Cook County *ex rel.* Jack O'Malley.

Kelly R. Welsh, Corporation Counsel (Bernard Rane, Assistant Corporation Counsel, of counsel), and Allen W. Cherry, of Legal Assistance Foundation, both of Chicago, and Jean M. Roche, of Jean M. Roche & Associates, of Oak Lawn, for other petitioners.

John P. Kelliher, Darrell S. Townsley, and David W. McGann, Special Assistant Attorneys General, of Chicago, for respondent Illinois Commerce Commission.

Edward A. Butts and Lincoln V. Janus, both of Illinois Bell Telephone Company, Louise A. Sunderland, and Douglas W. Trabaris, all of Chicago, for respondent Illinois Bell Telephone Company.

JUSTICE BOWMAN delivered the opinion of the court:

The parties come before us for the second time in this matter of administrative review of a filing by respondent, Illinois Bell Telephone Company (Bell or Company), with the Illinois Commerce Commission (Commission). The filing sought new and restructured telephone rates. The petitioners, who were intervenors in the proceedings before the Commission, consist of consumers and Bell's competitors. They seek review of an order of the Illinois Commerce Commission issued on remand. The consumer intervenors are: the People of Cook County *ex rel*. Jack O'Malley; the People of the State of Illinois *ex rel*. Roland W. Burris; Citizens Utility Board (CUB); Community Action for Fair Utility Practice; and the City of Chicago. The competitor intervenors are: Independent Coin Payphone Association (Payphone Association); Illinois Cable Television Association; and MCI Telecommunications Corporations (MCI). All of these intervenors, except the Illinois Cable Television Association, were also appellants in *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1990), 203 Ill. App. 3d 424 (*Illinois Bell I*), the prior appeal.

The intervenors collectively assert that (1) the Commission improperly limited the scope of the proceedings on remand, (2) the Commission's findings are not supported by substantial evidence, and (3) the Commission erred in ordering a change in Bell's method of charging for its monopoly services.

The background of this appeal is fully set forth in *Illinois Bell I* and will be repeated here only to the extent necessary to resolve the present issues. In December 1988 Bell filed rate sheets with the Commission proposing the adoption of a modified regulatory plan and a new rate schedule. Bell also provided revenue and expense information, including cost of service studies, to be used in the analysis which had to be performed before setting or changing rates and suggested the adoption of a new pricing scheme for many of its customers. Bell's proposals reflected that the Company offered both competitive and noncompetitive, or monopoly, services.

At the hearing Bell presented evidence on its proposed modified regulatory plan and rate schedule, as well as on the propriety of its cost of service studies. These studies were presented in order to demonstrate that the prices of Bell's competitive services were set above their costs and that Bell's competitive services, therefore, were not subsidized by its noncompetitive services. The Company needed to show that cross-subsidies did not occur in order to satisfy requirements set forth in article XIII of the Public Utilities Act (Act) (Ill.

Rev. Stat. 1989, ch. 111²/₃, par. 13—507). The Commission relied on Bell's cost of service studies in setting rates and adopting the price structure at issue in *Illinois Bell I*.

A Bell witness testified at the hearing that Bell's cost studies, which it called "Long Run Marginal Cost" (LRMC) studies, allocated many common costs but did not allocate the cost of common overhead, even though such costs constituted more than 20% of Bell's 1987 operating expenses. According to the witness, Bell did not allocate common overhead in its cost studies because any such allocation would be "arbitrary." The Commission ultimately issued an order which adopted a modified regulatory plan of its own, found Bell's cost of service studies to be reasonable and valid, and restructured certain Bell rates.

On appeal the intervenors challenged the Commission's conclusions regarding the modified regulatory plan and Bell's cost of service studies. They asserted that Bell's cost studies failed to protect against cross-subsidization because they did not adequately assess the cost of competitive services. In particular, the intervenors maintained that the costs which were utilized by Bell did not include any portion of the cost of common overhead.

In *Illinois Bell I*, we held that the Commission did not have the authority to adopt the modified regulatory plan and that the Commission's rate of return finding, because it was part of the regulatory plan, had to be reversed. We concluded our discussion by stating that reversal of the modified plan and rate of return findings made it necessary to reverse the order *in toto*. However, we then went on to examine several issues which we anticipated would be raised again on remand, including the matter of common overheads. We held that the statute required some apportionment of common overhead costs in order to determine whether the price of competitive services sufficiently covered their costs. Bell had not even attempted to make the requisite apportionment, and the Commission had improperly acquiesced in Bell's failure to do so. Consequently, the Commission had not complied with the statute. We reversed the order in its entirety and remanded the cause to the Commission.

On remand the Commission reopened the record in this matter for the sole purpose of taking evidence on the issue of Bell's allocation of common overhead costs. Testimony was filed by Bell, the Commission's staff (staff), and a number of the intervenors. Although MCI and the Payphone Association did not file testimony, they proposed that Bell be ordered to offer its competitive services through a completely separate subsidiary.

Bell's testimony on remand described and evaluated alternative methods for allocating common overhead costs. Several of the methods were ratio-based, *i.e.*, allocated in relation to measures like the revenue or underlying costs generated by a given service. Two other techniques—fully distributed cost studies and stand-alone cost studies—were proposed and explained by the intervenors. According to Dr. Richard Emmerson, Bell's expert witness on economics, all of the methods would result to some extent in allocation of costs in an arbitrary, or fixed, manner rather than on a cause and effect basis. Bell submitted exhibits identifying those accounts which incurred common overhead costs and the amount of such costs in each account. Bell determined its current overhead expenses to be $330 million. The Company also identified another category of common costs called the "residual revenue requirement" in the amount of $384 million.

Initially, Bell recommended use of what it referred to as the "attainable contribution method" for allocating common overhead costs, a method based on the relative profit generated by competitive and noncompetitive services. The staff, however, favored allocation based on the relative LRMC method, one of the other ratio-based methods described by Bell. The relative LRMC approach would work as follows. The Company had performed LRMC studies, which did not include common overhead costs, on most of its services, both competitive and noncompetitive. Using the results of these studies, the Company could establish the ratio of its competitive LRMC's to the total LRMC's of all of its services. This same ratio would then be applied to Bell's total common overhead costs to determine the amount of those costs to be allocated to competitive services. The record reflects that Bell's competitive services accounted for less than 4% of the company's total revenue.

In a proposed order on remand the hearing examiner rejected both the attainable contribution method proposed by Bell and the relative LRMC method supported by staff. The examiner found that these methods did not attempt to allocate common overheads on a cause and effect basis and, therefore, did not insure against cross-subsidies. The examiner ultimately concluded that fully distributed cost studies would provide a means properly to allocate Bell's common overhead expenses. Noting, however, that both Bell and staff strongly opposed development of such studies, the hearing examiner's proposed order, like MCI and the Payphone Association, concluded that Bell should be ordered to show cause why it should not be required to provide its competitive services through a separate subsidiary in order to eliminate cross-subsidization.

Bell filed a brief on exceptions to the hearing officer's proposed order on remand. Although expressing its continuing belief in the merit of the attainable contribution method, Bell acknowledged that it might be more appropriate for the Commission to adopt one of the more conventional allocation methods and embraced staff's proposal that the LRMC method be utilized.

In its final order, with two Commissioners dissenting, the Commission rejected the relevant findings of the hearing examiner's proposed order and adopted the staff-recommended relative LRMC method for allocating common overhead and similar expenses. The Commission also found that Bell had properly identified and adequately supported its determination that its common overhead costs were $330 million. Although we had not addressed the subject in *Illinois Bell I*, the Commission made additional findings regarding Bell's residual revenue requirement. The Commission found that this category had attributes similar to the common overhead cost category and concluded that it should be allocated in the same manner as the common overhead. Finally, the Commission determined that the amount of the residual revenue requirement identified by the Company, $384 million, was reasonable and should be adopted. The intervenors appeal from the Commission's order.

■ Initially, we must dispose of a motion by intervenor Cook County to supplement the record on appeal with transcripts of public meetings conducted by the Commission just prior to issuance of its final order on remand. We ordered the motion to be taken with the case. According to the motion, a number of the intervenors retained a court reporter to record the deliberations of the Commission on October 21 and 25, 1991, and November 1 and 4, 1991. On November 4, Cook County filed with the Commission a motion to incorporate into the record the transcripts of the October 21 and 25 meetings. The transcripts themselves were attached to the motion. The Commission never specifically disposed of the motion. Rather, in its November 4 final order on remand, the Commission ordered that any motions not yet resolved were "hereby disposed of consistent with the findings of this Order." Cook County now treats the transcripts of the October meetings as part of the record and insists that the Commission contemplated inclusion of the November transcripts in the record on appeal, also. Cook County reaches too far.

The October transcripts were merely attached to Cook County's November 4 motion when it was filed. That is the sole reason the transcripts appear in the record. Filing alone, however, does not make an attachment to a motion part of the record to be considered on re-

view. The Commission never directly addressed the motion but disposed of it in a general fashion, consistent with its final order.

On January 9, 1992, Cook County filed a renewed motion which sought, among other things, to supplement the record with both the October and the November transcripts. The county stated in its motion, and urges on appeal, that it "interprets" the Commission's findings in the final order on remand as a favorable ruling on its motion to incorporate the transcripts. Further, "[t]o the extent that the Commission is deemed not to have ruled on this issue," Cook County requested that its motion be reheard so the Commission's public comments regarding the case would be part of the record. On December 18, 1991, Cook County's motion was denied in its entirety. On this record we think Cook County's second attempt to have the transcripts made part of the record failed completely. It is plainly evident the Commission did not incorporate the county's materials into the record at that time.

We also perceive Cook County's "interpretation" that the Commission ruled in its favor on the initial motion as an attempt to bootstrap the transcripts into the record. Cook County notes the Commission's finding in the final order that all outstanding motions should be disposed of in a manner consistent with the ultimate conclusion of the order. Cook County contends that since the conclusions of the order are based upon the record, and since the deliberations of the Commission "relate" to the issues and evidence in the record, it is implicit that the Commission granted its motion. Cook County's argument falters on itself. The Commission's deliberations necessarily included consideration of the evidence in the record. That body of evidence had been completed before the Commission began its consideration. Therefore, the deliberations, which were *about* the record, cannot also be part of the record considered by the Commission.

Also, Cook County's argument is drawn in the broadest, most general terms. Nowhere are we told how including these particular transcripts would be consistent with any of the specific conclusions in the final order. More telling, however, is the absence of any reasoned contentions for including the transcripts in the record. That the Commission may have deliberated about the issues, the evidence, and its own final conclusions does not necessarily render those deliberations part of the record underlying the issues on appeal. Cook County's attempt to characterize the inclusion of the transcripts as something contemplated by the Commission is not well reasoned and cannot be sustained. The transcripts consist of internal Commission deliberations. They do not include a record of any testimony, hearings, oral

proceedings or oral arguments before the Commission or hearing examiner, as urged by the intervenors. Had the Commission wished to make the transcripts of its own discussions part of the record, it could easily have done so. However, it did not do so, and we see no compelling reason for incorporating the transcripts into the record. The motion is denied.

We turn now to more substantive concerns. This case represents the first telecommunications rate case to be brought under article XIII of the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 13—100 et seq.). Article XIII, the Universal Telephone Service Protection Law of 1985, recognized that some telecommunications carriers provide both competitive and noncompetitive, or regulated, services through joint or shared facilities rather than through fully separated subsidiaries. The new law purported to regulate such carriers through nonstructural separation methods, such as cost studies, rather than requiring them to maintain separate subsidiaries. While allowing carriers to maintain both kinds of service, the law prohibited cross-subsidization and discrimination in order to protect the captive ratepayers. If cross-subsidization could not otherwise be prevented, however, a separate subsidiary could be required. (See Ill. Rev. Stat. 1989, ch. 111²/₃, par. 13—508.) Basically, the intervenors here maintain that the Commission's order restructuring Bell's rates should be reversed because Bell did not adequately show that cross-subsidization would not occur.

■ The Act itself sets forth the standard of review of a Commission order. The reviewing court should reverse such an order if it finds that: (1) the Commission's findings are not supported by substantial evidence in the record; (2) the Commission acted beyond its authority; (3) the order violated a State or Federal statute or constitution; or (4) the administrative proceedings violated a statute or the Federal Constitution or laws, to the prejudice of the appellant. (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 10—201(e); Illinois Bell, 203 Ill. App. 3d at 433.) Substantial evidence consists of more than a mere scintilla but may be something less than a preponderance of evidence and is such evidence as a reasoning mind would accept as sufficient to support a particular conclusion. (Illinois Bell, 203 Ill. App. 3d at 433; Metro Utility v. Illinois Commerce Comm'n (1990), 193 Ill. App. 3d 178, 184.) The Commission's findings and conclusions regarding factual questions are to be held prima facie true, and Commission rules, orders and decisions are to be considered prima facie reasonable. (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 10—201(d); Illinois Bell, 203 Ill. App. 3d at 433.) The court is not barred, however, by the Commission's in-

terpretation of a question of law. (*Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 204; *Illinois Bell*, 203 Ill. App. 3d at 433.) On appeal the burden of proof on all issues rests with the party appealing. (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 10—201(d).) These principles guide our inquiry.

■ As a preliminary matter the consumer intervenors posit that the Commission improperly limited the scope of the remand proceedings to the issue of the allocation of Bell's common overhead costs. Specifically, intervenors insist that the remand also embraced issues concerning the LRMC cost of service studies prepared by Bell and used by Bell as the basis for allocating common overhead costs. The intervenors' position cannot be sustained.

While intervenors correctly point out that the LRMC's themselves consist substantially of costs associated with joint or shared expenses and facilities, our discussion of common costs in *Illinois Bell I* addressed only common overhead costs. We first set forth the intervenors' general argument that Bell's cost-of-service studies failed to guard against cross-subsidization and then discussed the specifics of that argument:

"The intervenors contend that Bell's cost studies do not adequately assess the cost of competitive services *because no portion of the cost of common overhead is allocated to competitive services.*" (Emphasis added.) (*Illinois Bell*, 203 Ill. App. 3d at 441.)

It appears that the intervenors themselves focused on the common overhead issue in the prior appeal.

Our explanation of Bell's position is also couched almost entirely in terms of common overhead costs. We ended our response to Bell's arguments by stating that it would be arbitrary and illegal for the Commission to "fail to make *some* apportionment of [*common overhead*] to competitive services when assessing the proper price of such services." (Emphasis in original.) (*Illinois Bell*, 203 Ill. App. 3d at 441.) Our ultimate conclusion was that the Commission had failed to comply with the statute when it accepted Bell's "failure to attempt even to apportion common overhead." (*Illinois Bell*, 203 Ill. App. 3d at 442.) Intervenors focus on isolated instances, some of them taken out of context, where we refer to "common costs" as opposed to "common overhead costs." The general tenor of the entire discussion, however, reflects our specific concern with common overheads.

The intervenors also point to language in *Illinois Bell I* where we reversed the Commission's order "*in toto.*" They argue that we thereby (1) rejected the Commission's decision that Bell's LRMC stud-

ies were valid and (2) intended that those studies should be reconsidered on remand. Intervenors misinterpret *Illinois Bell I*. In our prior opinion we held that the Commission lacked authority to adopt a modified regulatory plan, reversed the Commission's rate of return finding, and determined that the Commission had improperly failed to make an allocation of common overhead costs to competitive services. We concluded that we did not need to examine the other issues raised on appeal. None of the issues we cited constituted a challenge to Bell's basic LRMC cost studies. In sum, the specific issue of the validity of the LRMC's was not before us. Our reversal of the Commission's order *"in toto"* meant that, of the issues presented, we resolved all those which needed to be resolved at that point, and we resolved them against the Commission. We did not reverse a Commission finding that was not before us. In this regard we recall our express belief that, in the future, the Commission could devise a method, "whether LRMC" or another, which provides for apportionment of common overheads. (*Illinois Bell*, 203 Ill. App. 3d at 442.) *Illinois Bell I* did not hold that Bell's LRMC studies were invalid, and the Commission did not err in limiting the remand proceedings to the matter of allocation of Bell's common overhead costs.

Despite the limitations imposed by the Commission, on remand the parties attempted to raise questions about the validity of Bell's cost studies. These issues had been brought up previously, as reflected in the Commission's comment in its order on remand that several of the parties had reargued many of the points argued during the initial proceeding regarding the cost studies. The Commission merely reaffirmed its previous finding that Bell's cost studies were valid for purposes of setting rates. Intervenors now attempt to raise these matters once again, in this appeal. We observe in this regard that the record of the remand proceedings reflects no substantial debate over Bell's cost of service studies. Thus, much of the intervenors' extensive argument on the issue in this court cites to testimony in the original, rather than remand, record. However, as we have determined that the remand proceeding was properly limited to issues regarding allocation of common overhead costs, we decline to address the challenges to the validity of the underlying LRMC studies, at least insofar as those challenges were already made during the original proceeding.

We recognize that the consumer intervenors raised several new service cost study issues on remand and that the Commission considered those issues. Dr. Weiss, a CUB expert witness, critiqued Bell's studies, but the Commission found Weiss' criticisms to be not significant. One question raised by Weiss, *i.e.*, whether Bell's studies

were, in fact, LRMC studies, is discussed below. We have carefully reviewed Dr. Weiss' other observations and agree with the Commission that they were insubstantial.

One of Dr. Weiss' criticisms was based on an error in which an analyst had picked up and transferred a wrong column of figures from one page to another. The error did not cause the cost in question to change substantially, and Bell promptly corrected the mistake.

In another instance Weiss found a slight discrepancy between the cost figures offered by Bell for LRMC purposes in this proceeding and the same cost figures as revealed in a Bell cost study. The difference arose because the LRMC figures had been prepared for an earlier case before the ICC, and the updated figures from the cost study had not been substituted for purposes of this case. Bell explained that the LRMC costs had not been changed because the specific service involved was not at issue in this particular rate setting case. However, use of the relative LRMC method for allocating common overhead costs requires consideration of Bell's overall costs in the rate setting process, and the company's failure to update specific cost figures is not to be condoned. Nevertheless, it is clear from the two sets of numbers that Bell does update its cost studies and is in a position to change its LRMC figures when errors are found. In any event, the cost discrepancy noted by Weiss amounted to only $1.47 per month. We do not think the errors found by Weiss were of sufficient consequence to warrant a finding, as urged by the consumer intervenors, that Bell's overall cost studies were invalid and an unreasonable basis for setting rates.

■ MCI and the Payphone Association also attack Bell's cost studies as so flawed and unreliable as to provide no protection against cross-subsidies. The competitor intervenors cite seven examples of weaknesses in Bell's studies. We have carefully reviewed the record with regard to each of these examples. Several of them involve errors in cost studies done in both this case and other cases before the ICC. Each of the errors appears to have been inadvertent, usually involving mistakes in computation or in assumptions about costs. According to unrebutted testimony, Bell corrected two of the errors on its own initiative and corrected the other when it was discovered during the proceedings.

The intervenors also challenge a category of Bell's costs labeled "Other Services," which is not broken down into separate items. They insist there is no record evidence at all as to the costs of these services. However, all of the "Other Services" were noncompetitive in nature. There is no dispute that Bell did not perform LRMC studies

on each and every one of its noncompetitive services. Rather, the Company assumed that the revenue/cost relationship of the noncompetitive services for which it had not done cost studies was the same as for all other comparable noncompetitive services for which studies *were* done. Staff testified that since all the services involved were noncompetitive, it believed it was appropriate to use the revenue/cost relationship of noncompetitive services in general to determine the long-range marginal costs of the remaining noncompetitive services. It is noteworthy that, collectively, the services for which LRMC studies were not available represented only about 12% of the Company's total intrastate revenue base. While Bell's methodology for costing these services does not result in a perfect reflection of the causes of cost, the amount determined for the category is not totally without a basis, either, as intervenors suggest. All in all, the record does not support intervenors' claim that Bell provided no evidence at all of the costs of the "Other Services."

Another charge by intervenors is that Bell inconsistently allocated security and maintenance personnel costs to long-run marginal costs of individual services while, at the same time, it failed to similarly allocate other common personnel costs. Intervenors' position is based primarily on the testimony of Dr. Weiss. Bell presented rebuttal testimony by three different witnesses as to each account criticized by Weiss. Specifically noting, as we also observe below, that Weiss had analyzed Bell's common overhead expenses from the perspective of standards for fully distributed cost studies rather than long-range marginal cost studies, the Commission stated in its order on remand:

> "The Commission believes that Illinois Bell successfully demonstrated that [Dr.] Weiss used the wrong standard. Furthermore, the Commission finds that [the principles applied by Dr. Weiss] even if they were used, do not dictate inclusion of additional costs in the Company's individual service cost studies."

We note, too, the following footnote the Commission added to its discussion of the testimony:

> "In reaching its conclusions in the remanded proceedings, the Commission has given greater weight to the testimony of Dr. Emmerson on issues of pricing theory and allocation of costs. It is not surprising that experts in a highly contested proceeding will have different opinions on what is proper and reasonable."

One of the basic functions of the Commission is to evaluate the evidence before it. (*City of Chicago v. Illinois Commerce Comm'n* (1958), 15 Ill. 2d 11, 16.) The credibility of expert witnesses and the weight to be given their testimony are matters for the Commission as the

finder of fact. (*Lefton Iron & Metal Co. v. Illinois Commerce Comm'n* (1988), 174 Ill. App. 3d 1049, 1060.) The Commission enjoys broad discretion in ratemaking cases, and its findings will not be overturned unless they are against the manifest weight of the evidence. (*People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 145.) We have reviewed the testimony of both Weiss and Bell's rebuttal witnesses on this point and conclude that Bell's evidence, which obviously was accepted by the Commission, was sufficient to support the conclusion that Bell has properly allocated its common personnel costs. Since they are not contrary to the manifest weight of the evidence, the Commission's findings will not be overturned.

In sum, the flaws the competitor intervenors find in Bell's cost studies consist substantially of errors in computation and assumptions and reflect to some extent that Bell's figures were not as totally complete and up-to-date as they could possibly have been. However, in an inquiry involving the volume and magnitude of cost and revenue figures that are present in this case, we do not find it surprising that calculation errors were made. Also, the difficulty of keeping all the necessary figures up-to-date was acknowledged even by Dr. Weiss, who testified that telephone companies stagger cost studies for major services by two to three years. He indicated that, if figures are to be used in a regulatory proceeding, the companies have an obligation to make sure the numbers are the most currently accurate they can put in. Here, Bell corrected some of the errors on its own initiative, while others were corrected upon discovery during the administrative proceeding. The other weaknesses the intervenors cite are either not supported by the record or are matters of conflicting evidence which were properly resolved by the Commission. When all the evidence is considered, we think the Commission could properly have concluded that the errors pinpointed by MCI and the Payphone Association were not so egregious as to render Bell's cost of service studies useless for purposes of providing protection against cross-subsidies.

■ MCI and the Payphone Association also argue that Bell's cost studies are invalid as a matter of law due to a change in the statute. Sections 13—502(c) and 13—507 were recently amended to delete references to LRMC's and substitute the term "long-run service incremental" cost. (See Pub. Act 87—856, eff. May 14, 1992 (amended Ill. Rev. Stat. 1989, ch. 111⅔, pars. 13—502(c), 13—507).) According to the intervenors, this matter must be decided under the language of the amended statute and Bell's LRMC studies, therefore, are no longer acceptable. We find that we do not need to decide this question.

In its order on remand the Commission acknowledged that, despite their LRMC label, Bell's studies are technically long-run incremental cost (LRIC) studies. The Commission considered LRIC's to be a "reasonable proxy" for marginal cost. While the expert witnesses made clear that such studies are not identical to LRMC studies, they also testified that marginal cost is a special case of incremental cost and that modified LRMC's become characterized as LRIC's. The parties' experts essentially agreed that LRIC studies are generally acceptable for determining cost of service for regulated industries. Since the Company's studies are essentially LRIC in nature, we opine that they are in compliance with the statute as amended.

Having determined that Bell's cost studies were sufficient to withstand the new challenges made to them on remand, we now turn our attention to the matter of allocation of common costs. Intervenors contend that Bell's use of the relative LRMC method is inadequate because it allocates overhead costs on an arbitrary, rather than a cause and effect, basis. According to intervenors, this approach conflicts with our interpretation of the Act in *Illinois Bell I*. We do not think *Illinois Bell I* must be read to require precisely the kind of determination of costs that is demanded by intervenors.

In the original proceeding the Company made no allocation whatsoever of common overhead costs. *Illinois Bell I* made very clear that the Commission had to make some apportionment of these costs in order to comply with the statute. We did not, however, specify *how* such costs should be allocated. Nowhere did we tell the Commission that it was required to determine, with mathematical precision, exactly which common overhead costs were incurred by its competitive, as opposed to its noncompetitive, services. On the contrary, after noting that deference was due the Commission's findings, we left the methodology of allocating the relevant costs up to the Commission:

> "We trust that, in the future, the Commission will be able to arrive at a cost methodology, whether LRMC, stand-alone *or some other,* which makes an apportionment of the cost of common expenses, including common overhead." (Emphasis added.) (*Illinois Bell,* 203 Ill. App. 3d at 442.)

Thus, we specified *what* the Commission was required to do but not *how* the Commission was to do it. In its order on remand the Commission provided for a method of allocation of common overhead costs. The question now is whether that method is adequate for purposes of the statute.

■ The General Assembly has declared it to be the policy of the State of Illinois that "telecommunications should be available to Illi-

nois citizens at just, reasonable and affordable rates" and that consumers of regulated telecommunications services "should be required to pay only reasonable and non-discriminatory rates or charges and that in no case should rates or charges for non-competitive telecommunications services include any portion of the cost of providing competitive telecommunications services." (Ill. Rev. Stat. 1989, ch. 111²/₃, pars. 13—103(a), (d).) Section 13—507 of the Act addresses more fully the prohibition on shifting the cost of competitive services to noncompetitive services. We set forth the relevant paragraphs of section 13—507 in their entirety in order to better illustrate the relationship between the various parts of the provision:

> "In permitting, approving, investigating or establishing rates, charges, classifications or tariffs for noncompetitive services offered or provided by a telecommunications carrier which also offers or provides competitive services, the Commission shall not allow any subsidy of competitive services by noncompetitive services. In the event that facilities are utilized or expenses are incurred for the provision of both competitive and noncompetitive services, the Commission shall allow or establish rates or charges for the noncompetitive services which reflect only that portion of such facilities or expenses which it finds to be proper and reasonable. The Commission shall have the power to take or require such action as is necessary to ensure that rates or charges for noncompetitive services reflect only the value of facilities, or portion thereof, used and useful, and the expenses or portion thereof reasonably and prudently incurred, for the provision of such noncompetitive services. The Commission may, in such event, also establish, by rule, any additional procedures, rules, regulations or mechanisms necessary to identify and properly account for the value or amount of such facilities or expenses.

> For the purposes of this Section, the Commission shall not allocate to any competitive service all or part of the value of investment in facilities utilized, or expenses incurred, in connection with providing noncompetitive service." Ill. Rev. Stat. 1989, ch. 111²/₃, par. 13—507.

The thrust of section 13—507 is to thwart and prevent a dual, competitive/noncompetitive carrier from supporting and fostering its competitive operations at the expense of its regulated operations, which serve a captive clientele. At the same time the section contemplates situations where competitive and noncompetitive services will use the same facilities and incur shared expenses, making it difficult ·

to prevent cross-subsidies. The Act grants broad, general powers to the Commission to deal with such situations, but does not set forth any specific steps or procedures for the Commission to follow. In this case the Commission was required to determine whether Bell's competitive services were carrying their own weight and not operating to the detriment of captive customers. In *Illinois Bell I* we concluded that the Commission could not make the necessary determination absent *any* distribution of Bell's common overhead costs to competitive services. In the instant case the issue is whether the record supports the Commission's adoption of the relative LRMC method of distribution. We think it does.

The Commission basically decided that use of a relative LRMC process provided an adequate safeguard against cross-subsidization and that the costs allocated to noncompetitive services, therefore, were proper and reasonable, as required by the statute. (See Ill. Rev. Stat. 1989, ch. 111²/₃, par. 13—507.) While not binding on a court, an interpretation of a statute by the agency charged with administration of the statute is entitled to significant deference and is generally persuasive to the court. (*Milkowski v. Department of Labor* (1980), 82 Ill. App. 3d 220, 222.) Deference is warranted because agencies possess the experience and expertise necessary to make informed judgments. (*Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n* (1983), 95 Ill. 2d 142, 153.) The legislative decision to remedy harms through an administrative body recognizes the existence of complex problems and the need for an efficiency and expertise in solving those problems which cannot be supplied by specific, static laws. (*Ranquist v. Stackler* (1977), 55 Ill. App. 3d 545, 550.) The Commission's conclusion that the statute allowed use of the relative LRMC approach to allocation of overheads is both persuasive and supported by the record.

First of all, evidence was presented to show that apportionment of common overhead costs in relation to broad underlying costs is a common regulatory mechanism. Dr. Emmerson testified to this effect. In response to a data request from the hearing examiner, Emmerson's testimony was supported by reference to a text dealing with the theory and practices used to set prices for regulated utilities. Bell's response included the following quote from the text:

> "Although allocations have been done in literally dozens of ways in different regulatory proceedings, there are three approaches which have been used most frequently: the relative output method, the gross revenue and the attributable cost method. Under the [attributable cost method] the allocations of

common cost to different services is made based on such services' share *** of the total attributable cost over all services." S. Brown & D. Sibley, The Theory of Public Utility Pricing 45 (1986).

Further evidence regarding apportionment of common costs was offered by David Gebhardt, a witness for Bell, who testified in the original proceeding that cost of service studies for the Federal Communications Commission involve allocations of various costs using ratio-based methods. Specifically, he stated that expenses categorized as common overheads are allocated in the same proportion as three other very broad categories of costs. Too, Dr. Weiss, testifying for the intervenors, suggested allocation of common overheads based on the direct labor in the LRMC studies. Staff characterized this approach as a variant of the relative LRMC method. Cumulatively, the evidence supports the Commission's characterization of its chosen allocation method as a common practice in regulation of a utility.

The Commission also took into consideration the effect of the allocation methodologies on Bell's competitive services. Section 13—103(b) of the Act proclaims the following policy in addition to the policies already mentioned:

"[W]hen consistent with the protection of consumers of telecommunications services and the furtherance of other public interest goals, competition should be permitted to function as a substitute for certain aspects of regulation in determining the variety, quality and price of telecommunications services and *** the economic burdens of regulation should be reduced to the extent possible consistent with protection of the public interest." (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 13—103(b).)

This policy clearly contemplates that competition can be beneficial to consumers. The evidence shows that revenue produced on the Company's competitive side could generate contribution (profit) which would then be available to cover not only competitive costs but other common costs as well. Thus, the competitive operations could potentially benefit the captive ratepayers. However, if Bell was forced to establish a costly method of allocation, it might no longer be able to compete, and the revenue stream from competitive services would be lost.

Keeping in mind the competition factor, the Commission analyzed relative LRMC and the other methods on the basis of costs and benefits. The evidence shows and, in fact, there seems to be little dispute that common overhead costs cannot be assigned to the causes of those costs with exacting, mathematical precision. By their very nature such costs cannot be perfectly broken down. Consequently, all of the

methods considered by the Commission exhibited varying degrees of arbitrary allocation. Not only were the allocation methods arbitrary, however. Each one also had other characteristic weaknesses and drawbacks. In short, no one method emerged from the record as unquestionably superior to all the others with regard to the accuracy or efficiency of allocation of common overhead expenses.

As to the costs involved, again there is little question that the ratio-based methods are more economical than the methods suggested by the intervenors. Dr. Emmerson described the ratio approaches as "straightforward" and "easy to implement" and indicated that they would not impose "any significant cost burden on the regulator or the capital company." Two other methods, fully distributed cost studies (FDC) and stand-alone techniques, were characterized as "more complex" and "very expensive to design, implement and maintain." While the intervenors' witness, Dr. Weiss, testified that the cost of performing FDC studies was quite low, he himself had no direct experience developing such a study for a telecommunications carrier. The Commission accorded more weight to Bell's expert regarding cost questions.

■ In our view, the record reflects substantial evidence to support the Commission's conclusion that the more expensive FDC method would not produce any more meaningful or reasonable results than the relatively simple and inexpensive ratio-based methods favored by Bell and the staff. Moreover, Bell had already done LRMC studies for the rate case proceedings, and the data from those studies would be used to allocate the common overheads. The other methods would still have to be designed and implemented and, even then, might be susceptible to challenges requiring costly defense.

All in all, the evidence is persuasive that under the relative LRMC method common overhead costs could be satisfactorily allocated without incurring unwieldy expenses which might disrupt or destroy any benefits flowing to captive ratepayers from Bell's competitive services. The Commission's conclusion that application of relative LRMC methodology would result in a "proper and reasonable" allocation of common overhead costs to noncompetitive services, as required by the statute, was not against the manifest weight of the evidence.

As a closing note on the common overhead issue, we observe that the Commission considered merely including the common overhead costs in Bell's basic LRMC studies because such studies identify or allocate costs to causes. However, Bell's witnesses testified persuasively that this approach would have skewed the LRMC studies to the point

where they would no longer be considered LRMC in nature and would have resulted in invalid basic cost-of-service studies. The Commission was justified in rejecting this method.

Since we have concluded that the Commission properly used the LRMC method of allocating common overhead costs, we need not address the competitor intervenors' argument that the Commission erred in excluding expert testimony regarding the use of a fully separated subsidiary as a means of allocating common expenses. Error, if any, was harmless.

■ In an issue closely related to the matter of common overheads, the intervenors challenge the Commission's handling of the costs Bell calls its residual revenue requirement. Bell characterized these costs as similar to common overhead costs and treated them the same way. The hearing examiner stated in the proposed order on remand that the residual revenue requirement reflects "common costs other than overheads and the embedded cost of joint use facilities." She indicated in her conclusions that in a fully distributed cost study these costs would be assigned to products and services. In a memorandum to the Commission the hearing officer indicated that residual revenue requirement costs "can be assigned to products and services but they are not forward looking costs." The Commission found that the costs included in the residual revenue requirement had attributes similar to the common overhead costs in that they had no causal relationship to competitive services. The Commission further found that it was reasonable and proper to treat both types of costs the same.

The crux of the intervenors' argument is that costs in the residual revenue requirement category can be assigned on a cause and effect basis and the Commission's adoption of the relative LRMC method was unreasonable and not supported by the evidence. After reviewing the record on this issue in some detail, and analyzing both the hearing examiner's remarks and the intervenors' arguments, we conclude that the Commission made a proper decision.

It appears that there is, indeed, a category of residual revenue requirement costs. Although these costs are different from both LRMC and common overhead costs, some of them can be properly characterized as similar to common overheads in the sense that they are indivisible or not susceptible to being distributed based on cause and effect. Others, however, are historical, or "embedded," costs which can be separated out and distributed. However, based on the explanation of these costs by the hearing examiner and testimony given by Dr. Weiss, it appears the assignment of embedded costs to specific products and services can only be accomplished through a fully distributed

cost study. Thus, to the extent that the relevant costs are embedded, Bell would have to perform FDC studies to determine the causal relationship between the costs and the relevant services.

As discussed above, the FDC approach was justifiably rejected by the Commission with regard to common overheads. Dr. Emmerson testified that, like the ratio-based methods of allocation, FDC studies also make arbitrary allocations. Dr. Weiss' testimony also indicates that FDC studies depend on arbitrary allocation elements, although perhaps less so than the ratio-based methods. Too, as we have mentioned, FDC studies would be far less economical than the method adopted by the Commission. Finally, we find reasonable Bell's argument that, while residual revenue requirement costs must be distributed, it makes no sense to distribute them on the basis of FDC studies when the remainder of Bell's costs have been allocated as a matter of LRMC analysis.

It is worth noting in this regard that the statute itself required a competitive/noncompetitive carrier to perform a long-run marginal cost study when seeking a new or changed service classification. (See Ill. Rev. Stat. 1989, ch. 111²/₃, par. 13—502(c).) It also empowered the Commission to utilize LRMC studies for determining if charges exceeded costs and to order a carrier to conduct such a study. (See Ill. Rev. Stat. 1989, ch. 111²/₃, par. 13—507.) It is evident that FDC studies are something very different from LRMC studies. The approach espoused by the intervenors would mix these various methodologies together. No witness suggested distributing one category of costs on the basis of LRMC and another category on the basis of FDC. Both Dr. Emmerson and staff recommended using relative LRMC for all common costs. Dr. Weiss proposed FDC for both common overhead and residual revenue requirement costs. In sum, we find that the evidence supported the Commission's application of relative LRMC for allocation of the residual revenue requirement.

Apart from the method of allocation itself, intervenors also contest Bell's determination of the amount of its overhead costs. They focus on Dr. Weiss' testimony that, after analyzing the Company's claim of $300 million in overheads, he concluded that the rules Bell had followed in deciding what was overhead were too favorable to itself. Weiss found that a more realistic estimate of the Company's relevant expenses was $87 million. The Commission rejected Weiss' testimony and found that Bell had properly identified its common overhead costs and that the amount determined by Bell was reasonable. The record supports the Commission's determination.

Dr. Emmerson testified that, in practice, the process of determining whether a category of costs should be classified as a common overhead expense involves the experienced judgment of the cost analyst performing the cost study. David Gebhardt, director of Bell's rates and tariff division, did the cost studies involved here. He submitted an exhibit which showed accounts consisting entirely or partly of common overhead costs. The exhibit also reflected a dollar amount of such costs for each account. Gebhardt indicated that he analyzed each relevant account, determined what portion of each account should be considered common overhead, and directly determined the amounts of those costs. The witness explained that those functions incurring common overhead costs are performed for the Company as a whole, not for isolated services, and that is why they are common costs. We have examined the exhibits listing the common overhead expense categories and detailing the major functions of each and find that the Commission could have concluded that the costs of the functions listed could not be assigned to any individual product or service on a cost causative basis since they are functions which must be performed due to the mere existence of the firm.

As for Dr. Weiss' testimony, he identified Bell's common overheads on a completely different basis from that used by Bell. The Company relied on LRMC analysis; Dr. Weiss used accounting standards adopted by the Cost Accounting Standards Board (CASB) for the purpose of distributing defense contractors' costs. The Commission was justified in finding that these standards could not be used to determine whether Bell had properly identified its common overhead expenses in the context of LRMC analysis. Moreover, in rebuttal, Bell presented the testimony of Dean Fischer, an accounting expert with extensive knowledge of CASB principles. Fischer criticized Weiss' recommendations as inconsistent with CASB standards and indicated that CASB standards were established to accomplish a full distribution of costs rather than to determine LRMC's. Fischer further testified that Bell's designated common overhead costs fell well within the CASB's definition of such costs. Finally, Dr. Weiss' credibility was questioned when, despite his estimate that Bell's overheads should be about $87 million, he testified that common overhead expenses generally tend to be about 15% of the total revenues of local exchange companies such as Bell. Mr. Gebhardt testified that Bell's common overheads of $330 million were approximately 16% of its total revenues.

Intervenors level criticism at Bell's treatment of a number of specific common overhead costs on the ground that they could and should have been assigned to products and services. However, according to the record, some of the targeted costs were, in fact, so assigned, and the assignment of others was consistent with standard industry practice. We note, too, the Company's testimony that if certain kinds of costs did become product specific, they would be assigned as LRMC's. Collectively, the evidence is substantial and supportive of the Commission's conclusion that Bell had properly identified the nature and amount of its common overhead costs.

██ In a final issue not related to cost allocation, intervenors assert that the Commission's approval of expansion of Usage Sensitive Service (USS) into the Greater Illinois Area (GIA) was not supported by substantial evidence. USS is a pricing method which had been implemented in the Chicago area in March 1987. USS pricing bases rates on the four cost elements incurred by Bell in providing usage service: frequency, duration, distance, and time of day. For the most part customers who did not have USS paid a single, flat fee each month regardless of their actual telephone usage. The Commission found that expansion of USS was mandated because it better reflected costs and it promoted economic efficiency, more equitable customer charges, and competition. Although it was raised, we did not reach this issue in the first appeal.

Intervenors first assert that the Commission failed to follow its own procedure of requiring a utility to produce a cost benefit analysis and empirical data regarding capacity savings before approving expansion of USS. There is no merit to this argument.

Intervenors cite only one case, *Citizens Utility Board v. G T E North, Inc.* (1989), ICC Order Docket No. 86—0286, in support of their position. *GTE,* however, was a case in which CUB's challenge to GTE's tariffs was denied. The Commission did not require any additional studies from GTE. Rather, the Commission found criticisms of GTE's current cost study to be valid and indicated that a cost/benefit analysis should be submitted by GTE on future occasions when it filed tariffs to expand USS. The Commission did not establish any policy as to conditions for approval of USS in all cases. We agree with the Commission that each request to expand USS must be judged on its own merits as reflected in the record in that particular case. We further agree that policies applicable to more than one utility must be set in accord with section 10—101 of the Act (Ill. Rev. Stat. 1989, ch. 111⅔, par. 10—101), a section which was not invoked in *GTE.*

Also challenged by the intervenors are Bell's studies of USS in the Chicago area. One goal of USS is to shift telecommunications usage to off-peak hours so the Company need not expand its capacity for the limited peak hours. According to the Commission, Bell's studies demonstrated what would have happened absent implementation of USS in the Chicago area. The data reflected faster off-peak growth than peak growth in the Chicago area but equal peak and off-peak growth in the GIA, where customers pay a flat rate. The Commission attributed the differences in relative growth to the different rate structures and found that USS achieved efficiency gains in the Chicago area. Intervenors insist the differences could have occurred without USS. However, rebuttal evidence showed that Bell's studies covered a number of different groups of calls in the Chicago area: Chicago residence calls, suburban residence calls, Chicago business calls, and suburban business calls. All four of the groups showed the same usage pattern: calls per line grew faster in the off-peak period than in the peak period. Such a consistent pattern is highly persuasive that USS was the reason for the differences in rate of growth and supports the Commission's conclusion.

Intervenors strenuously attack the Commission's decision to approve USS pricing on the ground that such pricing does not produce gains in economic efficiency. Overall, the evidence on this specific question is equivocal. Intervenors' witnesses seemed to acknowledge at least the possibility that USS might result in some small increase in economic efficiency. The staff witnesses appeared to favor USS and recognized that, aside from the factor of economic efficiency, there were other compelling reasons to adopt USS. Although intervenors take issue with all those other reasons, their arguments are not persuasive. For the most part they consist of allegations or innuendo, rather than supported argument, or they are a rehash of previous arguments, or they present a highly technical proposition with no allowance made for the practical realities of providing telecommunications service.

In one contention intervenors criticized USS on the basis that it would not promote universal service. They focused on the inadequacies of Bell's billing format, charging that it did not encourage telephone usage since it did not contain enough information to give the customers control over their bills. However, during the proceedings Bell agreed to introduce a new bill format during 1990 to address these problems. We take judicial notice that Bell's bills now provide most, if not all, of the information referred to by the intervenors.

The basic and pervasive question in this case has been whether the Commission's findings and, in turn, its decisions were supported by substantial evidence. The evidence has often been conflicting, the opinions of the expert witnesses consistently divergent. Setting utility rates is a legislative rather than a judicial function. (*Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 204; *People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 142.) In the rate-making scheme the Commission, not the court, is the fact-finding body. (*Hartigan*, 117 Ill. 2d at 142.) The credibility of expert witnesses and the weight to be accorded their testimony are peculiarly matters for the Commission as the finder of fact. (*Lefton Iron & Metal Co. v. Illinois Commerce Comm'n* (1988), 174 Ill. App. 3d 1049, 1060.) The Commission's decisions are entitled to great deference because they result from the deliberations of members who are better qualified to interpret evidence supplied by specialists and technicians. (*Lefton*, 174 Ill. App. 3d at 1060.) We have reviewed the record and find that, assuming the evidence supporting the Commission's position was accepted and believed, that evidence was substantial, as required by the statute. The Commission ultimately concluded that Bell had adequately shown, with particular reference to its common costs, that cross-subsidization would not occur under the new rate structure. We believe a reasonable person would accept the favorable evidence in this case as sufficient to support that conclusion. See *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1990), 203 Ill. App. 3d 424, 433; *Metro Utility v. Illinois Commerce Comm'n* (1990), 193 Ill. App. 3d 179, 184.

For all of the reasons set forth above the order of the Commission is affirmed.

Affirmed.

DUNN and DOYLE, JJ., concur.