188

ILLINOIS BELL TELEPHONE COMPANY, Petitioner-Appellant, v. ILLINOIS COMMERCE COMMISSION, Respondent-Appellee (The People *ex rel.* James E. Ryan, Attorney General, Intervening Respondent-Appellee).—CITIZENS UTILITY BOARD, Petitioner-Appellant, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees (The People *ex rel.* James E. Ryan, Attorney General, Intervening Respondent-Appellee).—CITIZENS UTILITY BOARD, Petitioner-Appellant, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees (LDDS Metromedia Communications Company *et al.*, Petitioners; The People *ex rel.* James E. Ryan, Attorney General, Intervening Respondent-Appellee).—MCI TELECOMMUNICATIONS CORPORATION, Petitioner-Appellant, v. ILLINOIS COMMERCE COMMISSION, Respondent-Appellee (The People *ex rel.* James E. Ryan, Attorney General, Intervening Respondent-Appellee).—AT&T COMMUNICATIONS OF ILLINOIS, INC., Petitioner-Appellant, v. ILLINOIS COMMERCE COMMISSION, Respondent-Appellee (The People *ex rel.* James E. Ryan, Attorney General, Intervening Respondent-Appellee).

Second District   Nos. 2—94—1272, 2—94—1440, 2—94—1443, 2—94—1464, 2—94—1468 cons.

Opinion filed July 17, 1996.

Edward A. Butts, Brian R. Gilomen, Lincoln V. Janus, Mark R. Ortlieb, Louise A. Sunderland, and Paul T. Dahlquist, all of Chicago, for petitioner and respondent Illinois Bell Telephone Co.

Edward Washington II and Clyde Kurlander, both of Chicago, for petitioner MCI Telecommunications Corp.

Karen L. Lusson, of La Grange, and Wanda K. Zatopa, and Susan L. Satter, both of Chicago, for petitioner Citizens Utility Board.

Larry J. Salustro and Maria G. Arias-Chapleau, of Chicago, for petitioner AT&T Communications of Illinois, Inc.

Henry T. Kelly, John F. Ward, and Michael W. Ward, all of O'Keefe, Ashenden, Lyons & Ward, of Chicago, for petitioners Illinois Public Telecommunications Association and LDDS Metromedia Communications Co.

John P. Kelliher, Assistant Attorney General, G. Darryl Reed, and Darrell S. Townsley, all of Chicago, and Richard S. Wolters, of Springfield, for respondent Illinois Commerce Commission.

James E. Ryan, Attorney General, of Chicago (William F. Cottrell, Janice A. Dale, and Eve Moran, Assistant Attorneys General, and David I. Fein, Marie D. Spicuzza, and Leijuana Doss, Assistant State's Attorneys, of counsel), for intervening respondent.

JUSTICE HUTCHINSON delivered the opinion of the court:

The present case is a direct appeal from an order of the Illinois Commerce Commission (Commission). See 220 ILCS 5/10—201 (West 1994). Illinois Bell Telephone Company (Bell) initiated this proceeding by filing a petition in Commission docket No. 92—0448 to regulate rates and charges for noncompetitive services under an alternative form of regulation (petition). See 220 ILCS 5/13—506.1 (West 1994). The Citizens Utility Board (CUB) then filed a complaint in Commission docket No. 93—0239 for an investigation and reduction of Bell's rates (complaint). See 220 ILCS 5/9—250, 10—108 (West 1994). American Telephone & Telegraph Communications of Illinois, Inc. (AT&T), MCI Telecommunications Corporation (MCI), and the Attorney General (AG) intervened in Bell's petition. On August 11, 1993, the Commission's hearing examiners consolidated the proceedings. The AG, as an appellee, has filed a brief in support of the Commission's final order of October 11, 1994. We have consolidated the appeals of Bell, CUB, AT&T, and MCI.

## ISSUES PRESENTED FOR REVIEW

The parties raise a variety of issues concerning the Commission's order. CUB contends (1) the Commission failed to incorporate an adequate price index or earnings sharing proviso into the order; (2) the order permits Bell to earn monopoly profits in violation of section 13—506.1 of the Public Utilities Act (Act), which requires rates to be "just and reasonable"; (3) if section 13—506.1 allows the Commission to promulgate a regulatory scheme permitting monopoly profits, such legislation is beyond the State's police powers and is therefore void and unconstitutional; (4) section 13—506.1 represents an impermissibly vague and illegal delegation of authority by the legislature; (5) the Commission violated section 13—506.1 by allowing Bell: (A) pricing flexibility of 2% per year for noncompetitive services in addition to any changes provided for by the price-cap index, and (B) to meet the cross-subsidy test (see 220 ILCS 5/13—507 (West 1994)) by using a revenue test rather than a revenue-requirement test; (6) the Commission adopted Bell's reduction in test-year revenue levels improperly, based on selective evidence which ignored uncontroverted evidence demonstrating an increase in Bell's revenue levels; (7) the Commission erred as a matter of law and fact by: (A) deregulating Bell's depreciation rates, (B) amortizing an alleged depreciation reserve deficiency, and (C) adopting a five-year amortization of an alleged reserve deficiency in Bell's analog-switching account; (8) the Commission failed to apply section 9—230, thereby increasing the cost of capital charged to ratepayers because of Bell's affiliation with Ameritech; (9) the Commission ignored substantial evidence by refusing to modify Bell's capital structure to avoid excessive cost of capital; (10) the Commission failed to hold Bell to its burden of proof; (11) Bell did not meet its burden of proof; and (12) the Commission unlawfully shifted the burden of proof to CUB.

On appeal Bell argues the Commission (1) acted arbitrarily and without evidence by including in the inflation offset to the price-cap index the entire 1.1% input price adjustment related to lower interest rates and by increasing the consumer productivity dividend from 0.5% to 1%; (2) acted arbitrarily and without evidence by imputing $51 million to Bell's regulated revenues on the theory that Ameritech, unilaterally and without compensation for Bell, guaranteed Bell would exercise its contract renewal option with the publishers of the Yellow Pages; (3) in determining Bell's fair rate of return on equity: (A) applied an improper legal standard, and (B) improperly refused to consider relevant evidence; (4) erred in disallowing depreciation expense and reducing Bell's rate base to reflect the average vacancy level in Bell's facilities; (5) acted arbitrarily and without

evidence by excluding all discretionary services from the residence service basket; and (6) acted arbitrarily and without evidence by capping service rates for five years instead of three years.

AT&T asserts the Commission (1) erred by ordering rate reductions in bands B, C, and D because such rate reductions would give Bell an anticompetitive advantage for the provision of these services; (2) in the alternative should have ordered Bell to implement across-the-board rate reductions to Bell's switched access services instead of rate reductions to bands B, C, and D.

Finally, MCI contends (1) the Commission violated section 13—506.1 by: (A) granting Bell price flexibility for noncompetitive services without evidence to support such flexibility, (B) not ordering intraMSA 1 equal access and presubscription as a *quid pro quo* offsetting the decreased regulation of Bell, and (C) implementing pure price regulation of Bell's noncompetitive services given Bell's refusal to open its local monopoly to competition; and (2) the Commission erred in reducing Bell's local usage rates below imputed costs without ordering a corresponding decrease in carrier access rates.

Before discussing the facts, it is necessary to address the appellants' complete failure to provide the required table of contents of the record on appeal. Rule 342(a) dictates:

"The appellant's brief shall include *** a complete table of contents, with page references, of the record on appeal. The table shall state:

(1) the nature of each document, order, or exhibit, *e.g.*, complaint, judgment, notice of appeal, will, trust deed, contract and the like;

***

(3) the names of all witnesses and the pages on which their direct examination, cross-examination, and redirect examination begin." 155 Ill. 2d R. 342(a).

In lieu of a complete table of contents of the record on appeal, appellants have reproduced an index apparently created by the Commission. This index does not state the nature of the exhibits, the names of the witnesses, or the pages on which direct examination, cross-examination, and redirect examination begin. This lack of a proper table of contents is especially troublesome because this record is voluminous: it is comprised of seven crates, 130 volumes, and thousands of pages of testimony and exhibits.

The appellants are warned that any future failure to provide a proper table of contents will have serious repercussions. The provision of a table of contents conforming to Rule 342(a) is not a request;

it is a mandate. See *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 14-15 (1995). Because this is the first time section 13—506.1 has been construed and the form of alternative regulation crafted by the Commission will substantially affect the vitally important telecommunications industry (see 220 ILCS 5/13—102, 13—103 (West 1994)), we will address the merits of the appellants' arguments. In the future, the failure to comply strictly with Rule 342(a) will result in the dismissal of appellants' appeals.

## FACTUAL OVERVIEW

Section 13—506.1 was enacted to empower the Commission to adopt alternative forms of regulation for noncompetitive telecommunications services. Traditionally, the regulation of noncompetitive telecommunications services has been accomplished through the rate of return (ROR) method. The regulatory framework for ROR regulation is found in the Public Utilities Act (Act) (220 ILCS 5/1—101 *et seq.* (West 1994)). At its most rudimentary level, ROR regulation comprises a Commission determination of what is a reasonable ROR on the utility's equity; the Commission then sets rates at levels designed to produce the target ROR. *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 203 Ill. App. 3d 424, 428 (1990) (*Illinois Bell Telephone Co. I*); see generally 220 ILCS 5/9—101 through 9—252 (West 1994). On December 13, 1988, Bell filed a request for, and the Commission eventually promulgated, an alternative regulatory plan. *Illinois Bell Telephone Co. I*, 203 Ill. App. 3d at 427. On appeal we reversed the plan as beyond the Commission's authority. *Illinois Bell Telephone Co. I*, 203 Ill. App. 3d at 437-39, 442. Section 13—506.1 was enacted to expand the statutory authority of the Commission and thereby remedy the problem identified in *Illinois Bell Telephone Co. I.*

Section 13—506.1 specifically grants the Commission the authority to "implement alternative forms of regulation in order to establish just and reasonable rates for noncompetitive telecommunications services including, but not limited to, price regulation, earnings sharing, rate moratoria, or a network modernization plan." 220 ILCS 5/13—506.1(a) (West 1994). Either a telecommunications carrier or the Commission on its own motion may initiate consideration of an alternative regulatory plan. 220 ILCS 5/13—506.1(b) (West 1994). In determining the appropriateness of any alternative plan, the Commission must consider both the "public policy goals declared in Section 13—103," and whether the regulatory plan will: "(1) reduce regulatory delay and costs over time; (2) encourage innovation in services; (3) promote efficiency; (4) facilitate the broad dissemination of

technical improvements to all classes of ratepayers; (5) enhance economic development of the State; and (6) provide for fair, just, and reasonable rates." 220 ILCS 5/13—506.1(a) (West 1994). The Commission may implement a plan

"only if it finds, after notice and hearing, that the plan or modified plan at a minimum:

(1) is in the public interest;

(2) will produce fair, just, and reasonable rates for telecommunications services;

(3) responds to changes in technology and the structure of the telecommunications industry that are, in fact, occurring;

(4) constitutes a more appropriate form of regulation based on the Commission's overall consideration of the policy goals set forth in Section 13—103 and this Section;

(5) specifically identifies how ratepayers will benefit from any efficiency gains, cost savings arising out of the regulatory change, and improvements in productivity due to technological change;

(6) will maintain the quality and availability of telecommunications services; and

(7) will not unduly or unreasonably prejudice or disadvantage any particular customer class, including telecommunications carriers." 220 ILCS 5/13—506.1(b) (West 1994).

The legislature incorporated several safeguards in section 13—506.1 including: (1) requiring that, in the first three years of a plan, the basic residence service rates be no higher than the rates in effect 180 days before the filing of the plan (220 ILCS 5/13—506.1(c) (West 1994)); (2) requiring at least annual reports documenting the telecommunications service is complying with the plan (220 ILCS 5/13—506.1(d) (West 1994)); (3) providing for the rescission of a plan on the motion of any person alleging that rates under the plan are "unfair, unjust, unreasonable, unduly discriminatory, or are otherwise not consistent with the requirements of this Article" (220 ILCS 5/13—506.1(e) (West 1994)); and (4) ensuring that preexisting safeguards against discriminatory or unjust rates are not subject to implied repeal (220 ILCS 5/13—506.1(f) (West 1994)).

Section 13—506.1 expresses the legislature's determination that the telecommunications industry must be transformed from a regulated monopoly into a system of fully competitive markets. The legislature has found that "universally available and widely affordable telecommunications services are essential" to Illinois and its citizens. 220 ILCS 5/13—102(a) (West 1994). Understandably then, article 13 of the Act provides for the regulation of the telecommunications industry. See 220 ILCS 5/13—101 *et seq.* (West 1994). Article

13, however, will automatically be repealed on July 1, 1999. 220 ILCS 5/13—803 (West 1994). Therefore, some force must take the place of Commission regulation to ensure continued availability and affordability. That force is the implementation of free-market mechanisms designed to lead to the creation of competitive markets for all forms of telecommunication services. See 220 ILCS 5/13—103(b) (West 1994) ("it is the policy of the State of Illinois that *** when consistent with the protection of consumers of telecommunications services ***, competition should be permitted to function as a substitute for certain aspects of regulation"). Section 13—506.1 is a tool to move the telecommunications industry from monopoly to market.

Although Bell's alternative regulatory plan arises under section 13—506.1, the present case still implicates all of the issues associated with traditional ROR regulation. In its petition, Bell identified its proposed plan as "pure price" or "price cap" regulation. As a starting point, therefore, Bell was required to prove that the rates in place at the inception of the plan were reasonable. For this reason, Bell submitted "all of the conventional cost of capital, accounting and other evidence associated with general rate cases." CUB's complaint challenges the propriety of Bell's preplan rates and requests a rate reduction of $209 million.

Price-cap regulation, as envisioned in Bell's petition, utilized a formula to determine the amount Bell may change the rate its customers pay. Under price-cap regulation, Bell's "going-in" rate would be determined using ROR regulation. The price index would dictate how much Bell would be permitted to raise these going-in rates. Bell's proposed price-cap index included three components measuring (1) inflation in the general economy; (2) Bell's differential growth in productivity and input price; and (3) the quality of service delivered by Bell. The price-cap index would be calculated by subtracting Bell's historical productivity growth from the general inflation rate and then adding or subtracting the service quality component. The product of this calculation, the price-cap index, represents the percentage of the then current rates Bell would be permitted to raise its rates.

Bell's plan divided customers into four separate categories. Each category was referred to as a "basket" and represented a major class of Bell customers. The four baskets are residential, business, carrier, and other. Under Bell's plan the price index would be applied to each basket separately. The aggregate annual rate increase for each basket would not exceed the price-cap index. Rates for services within each basket may increase annually by as much as the price index plus 5%, provided that other rates for services within the basket are reduced to offset any increase beyond the index.

The price-cap plan would not provide for either the regulation or monitoring of Bell's earnings. Bell would have the authority—limited only by the price-cap index—to manage its business. Put simply, the price-cap index assumes the function of general rate proceedings. As part of price-cap regulation, Bell would be allowed to set its own depreciation rates. Within this framework Bell and its shareholders would bear both the benefits and risks common to businesses that are not guaranteed a particular return on investment.

The Commission gathered large amounts of evidence and heard extensive testimony. Over 20 parties intervened or entered appearances in the underlying proceedings. Nearly two years elapsed between the filing of Bell's petition and the issuance of the Commission's order. The order adopted a modified version of Bell's alternative regulatory plan. In accordance with Commission administrative rule, Bell filed the petition based on data from a one-year test period. See 83 Ill. Adm. Code § 285.150 (1985). Bell chose the 12 months of data representing September 1, 1991, through August 31, 1992, to determine the revenues and expenses upon which Bell's going-in rates were set.

The Commission found that Bell's intrastate net original cost rate base (invested capital) of its telephone plant providing services in Illinois was $2.917 billion (all figures above one billion have been rounded to the nearest million). This figure included downward adjustments from Bell's proffered original cost rate base of $3.122 billion. Included among these downward adjustments were $48.794 million—$1.3 million of which represented depreciation expenses—reflecting the average vacancy levels of Bell-owned facilities.

The Commission also found that Bell's operating income was $281.188 million. In determining Bell's operating income, the Commission made several adjustments to the revenues and expenses proffered by Bell. Among these were a $51 million upward adjustment of Bell's revenue. This was done to account for revenues the Commission found Bell could have earned had it engaged in arm's-length negotiations and exercised its exclusive option with the publisher of the Yellow Pages.

The Commission's price-cap index differed from the index proposed by Bell. The Commission's price-cap index included measurements of (1) inflation in the general economy; (2) Bell's differential growth in productivity and input price; (3) a consumer productivity dividend; (4) the quality of Bell's service; and (5) any exogenous changes affecting rates. Once Bell's existing rates were determined to be reasonable, the inaugural price-cap index would be set at "100.00." The price-cap index would then be updated annually

to determine how much Bell could adjust its rates. The formula for calculating the annual adjustment to the price-cap index is as follows:

price index for the current year = price index of the prior year (1 + [% change in inflation]/100 – differential growth in input price and productivity – consumer productivity dividend + or – exogenous changes + Bell service quality measurement).

The Commission settled upon the gross domestic product price index (GDPPI) as its measure of inflation in the general economy. In its order the Commission stated, "There is unanimous opinion among the expert witnesses in this proceeding that a price regulation formula should be based on standards established through the use of economy-wide or industry-wide data." The Commission noted that use of the GDPPI was advocated by both Bell witness Laurits Christensen and AG witness Lee Selwyn. According to the Commission, Christensen and Selwyn are "nationally recognized experts on price regulation." Commission staff witness Charlotte Terkeurst stated that the GDPPI must be adjusted periodically to account for shifts in the economy; to remain accurate, therefore, the GDPPI's various components must be reweighed to ensure the comparability of GDPPI taken from different years. Towards this end, as part of the price regulation plan, Bell is "required to include in its annual price regulation filing an identification and reconciliation of any periodic updates to the GDPPI weights." The GDPPI is calculated and published by the United States Department of Commerce.

Growth rates of productivity and input price—cost of all goods and services used to produce the goods and services sold by a firm—historically have differed between the telecommunications industry and the general economy. In its order the Commission states, "The telephone industry has experienced lower input price growth and higher productivity growth than the economy as a whole, and this has been reflected in lower output price growth by the telephone industry." In order to reflect accurately this historical difference between Bell and economy-wide output price growth, the Commission found that the GDPPI would have to be adjusted.

The Commission reduced the GDPPI by 2% to reflect Bell's differential input price. According to Christensen and AG witness David Roddy, the GDPPI grew at 3.7% per year from 1984 through 1991; during this time span Bell's input prices grew at a rate of GDPPI minus 1.6%. From this, the Commission determined that "Bell's input prices grew at a rate 2.5% slower than economy-wide input prices." The AG argued that Bell's input price differential was permanent and caused by "structural changes resulting from the AT&T

divestiture." The Commission agreed with the AG and found that the GDPPI should be adjusted to reflect Bell's input price differential. However, the Commission agreed with Christensen that 0.5% of the 2.5% difference between Bell and economy-wide input prices was attributable to changes in the tax laws. Because these changes were not likely to be repeated, the Commission reduced the input price differential growth component from 2.5% to 2%.

The Commission also reduced the GDPPI by 1.3% to reflect Bell's differential productivity growth. To quantify Bell's differential productivity growth, Christensen used a statistical measure known as total factor productivity (TFP). TFP is the ratio of an organization's total output to its total input. This ratio is a comprehensive measure of a firm's productivity. The Commission adopted Christensen's differential TFP of 1.3% as a downward adjustment to the GDPPI. This accounts for Bell's historic ability to outstrip the productivity performance of the economy as a whole (as represented by the GDPPI). The Commission observed both the Federal Communications Commission (FCC) and other jurisdictions use methodologies based on differential productivity growth rates.

The Commission's plan incorporated a 1% consumer productivity dividend to ensure ratepayers benefit from efficiency gains brought about by alternative regulation. See 220 ILCS 5/13—506.1(b)(5) (West 1994). Bell argued that a continuation of its historic productivity performance would provide ratepayers with sufficient benefits. The Commission rejected this argument because the inclusion of a consumer productivity dividend ensures "ratepayers will receive the first cut from any improvements beyond historical performance which arise from technological and regulatory change." The Commission stated, "The evidence in the record indicates that the selection of an appropriate consumer dividend is largely judgmental." AG witness Selwyn testified that a consumer productivity dividend "would both encourage [Bell] to improve its overall efficiency and also recognize the salutary effects of incentive regulation itself in stimulating *additional* productivity improvements." (Emphasis added.) Recognizing the importance of ensuring consumers share in this additional productivity benefit, the Commission adopted Selwyn's recommended consumer productivity dividend of 1%.

The Commission maintained the ability to adjust the price-cap index formula to account for certain exogenous changes. Exogenous changes are changes in costs over which Bell has no control. According to the plan, exogenous changes will be considered only if the (1) cost is truly outside of Bell's control; (2) cost is not already reflected in the GDPPI; (3) financial effects of the cost are quantifiable and

verifiable; and (4) change in cost, either positive or negative, is $3 million or greater. The order contained specific examples of items warranting exogenous factor treatment and the manner of calculating the factors. The Commission also ordered that any adjustment of the price-cap index reflecting an exogenous change could only be made if the Commission deemed such an adjustment necessary.

The price-cap index included a service quality adjustment. The service quality adjustment is an additional possible downward adjustment to the GDPPI. The Commission accepted the eight measurements of quality of service proposed by Bell. In each category Bell will be evaluated annually to determine if service quality is being maintained. If quality in a particular category is maintained, Bell receives a score of zero; if the objective measure in a particular category declines, Bell receives a score of -0.25%. If Bell maintains service quality in all eight categories, there will be no additional adjustment to the GDPPI; if, however, all eight measurements decline, the additional downward adjustment would equal 2%. The total downward adjustment to GDPPI, excluding any exogenous changes or service quality adjustment, equals 4.3% (*i.e.*, 2% [input price differential] + 1.3% [productivity growth differential] + 1% [consumer productivity dividend]).

As Bell proposed in its petition, services are divided into four separate service baskets. Three of the baskets group services furnished to a particular customer class (*i.e.*, residential, business, and carrier). The residential basket contains only network access line charges and band A, B, and C usage charges. Each "band" refers to a distance range telephone calls travel, *e.g.*, any call between two points 8 to 15 miles apart is termed a "band B" call. The fourth basket is designated "other." It contains a variety of services including discretionary services often purchased by residential ratepayers (*e.g.*, call waiting, caller identification, and three-way calling). The price-cap index is applied to determine the reasonableness of the aggregate increase in the prices of services contained in each basket. A presumption of reasonableness applies to all price increases equal to or less than the percentage change in the price-cap index. Additionally, Bell may increase the rate for an individual service by 2% in addition to the percentage change in the price-cap index. Any use of the 2% pricing flexibility must be offset by a corresponding decrease to another service or services within the same service basket. As a result, the aggregate rates for any service basket may not increase more than the percentage change in the price-cap index.

The Commission capped basic residence service rates for the plan's first five years. The Commission defined "basic residence ser-

vices" to include residence network access line rates for access areas A, B, and C, band A residence usage service, and flat rate residence usage service in selected areas. Additionally, the Commission placed a five-year cap on bands B and C residence usage services.

In presenting our factual overview, we have simplified certain mechanisms of the alternative regulatory plan. This is done with an eye towards burdening the reader with only the information necessary to understand the parties' contentions. Additional factual matters will be discussed as required.

## STANDARD OF REVIEW

■ Our role in reviewing an order of the Commission is limited. Factual findings and conclusions are "held prima facie to be true and as found by the Commission." 220 ILCS 5/10—201(d) (West 1994); *People ex rel. O'Malley v. Illinois Commerce Comm'n*, 239 Ill. App. 3d 368, 376 (1993). Additionally, the rules, regulations, decisions, and orders of the Commission are "held to be prima facie reasonable." 220 ILCS 5/10—201(d) (West 1994); *People ex rel. O'Malley*, 239 Ill. App. 3d at 376. The Act expressly places the burden of proof on all issues raised by appeal on the appellants. See 220 ILCS 5/10—201(d) (West 1994); *People ex rel. O'Malley*, 239 Ill. App. 3d at 376. The reversal of a Commission order is appropriate if the reviewing court determines:

> "A. The findings of the Commission are not supported by *substantial evidence* based on the entire record of evidence presented to or before the Commission for and against such rule, regulation, order or decision; or
>
> B. The rule, regulation, order or decision is without the jurisdiction of the Commission; or
>
> C. The rule, regulation, order or decision is in violation of the State or federal constitution or laws; or
>
> D. The proceedings or manner by which the Commission considered and decided its rule, regulation, order or decision were in violation of the State or federal constitution or laws, to the prejudice of the appellant." (Emphasis added.) 220 ILCS 5/10—201(e)(iv) (West 1994).

In appeals from the Commission, substantial evidence is defined as more than a scintilla—although it need not rise to the level of a preponderance—of evidence, such that a reasoning mind would find the proffered evidence sufficient to support a particular conclusion. *Illinois Bell Telephone Co. I*, 203 Ill. App. 3d at 433; *Metro Utility v. Illinois Commerce Comm'n*, 193 Ill. App. 3d 178, 184 (1990), citing Black's Law Dictionary 1281 (5th ed. 1979). Additionally, we are neither allowed to reevaluate the credibility or weight assigned to evi-

dence (*People ex rel. Hartigan v. Illinois Commerce Comm'n*, 117 Ill. 2d 120, 147 (1987) (*People ex rel. Hartigan I*)) nor substitute our judgment for that of the Commission (*Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 55 Ill. 2d 461, 469 (1973) (*Illinois Bell Telephone Co. II*)).

The evaluation and construction of an alternative regulatory plan for a telecommunications company is a vastly complex matter. Indeed, the record is replete with the testimony of and exhibits prepared by mathematicians, statisticians, economists, and sundry experts in the arcane field of utility regulation. With this in mind, we note the Commission's judgment is based on particularized expertise and experience and therefore is given great weight. *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 12 (1994) (*United Cities Gas Co. I*), citing *Village of Apple River v. Illinois Commerce Comm'n*, 18 Ill. 2d 518, 523 (1960) (wisdom of a Commission decision based upon complex scientific and technological evidence is not open for inquiry); *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 153 (1983) (Commission expertise and experience necessary to make informed judgment). However, the Commission's interpretation of statutory standards is not accorded the same deference as its findings and conclusions of fact. *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 121 (1995) (*Citizens Utility Board I*). As a result, we are not bound by the Commission's interpretation of law. *Citizens Utility Board I*, 166 Ill. 2d at 121. We may, therefore, in whole or part, affirm, reverse, or remand for further proceedings any order of the Commission. *People ex rel. Hartigan v. Illinois Commerce Comm'n*, 148 Ill. 2d 348, 367 (1992) (*People ex rel. Hartigan II*).

## DISCUSSION

We begin with a note concerning the order in which the parties' contentions will be addressed. In total, Bell, CUB, AT&T, and MCI present 28 distinct questions for review. To aid comprehensibility, our discussion is divided into several substantive headings. The questions for review have been grouped under these headings. Our discussion, therefore, moves from one substantive area (*e.g.*, "Commission authority under the Act") to another, rather than addressing all the contentions of a party before moving onto the contentions of another party.

## I. COMMISSION AUTHORITY UNDER THE ACT

■ CUB asserts that, if section 13—506.1 authorizes the promulgation of a regulatory scheme permitting monopoly profits, such legislation is void and unconstitutional as beyond the state's police powers.

Under the police power, the state has the power to legislate to protect the public health, morals, safety, or welfare, provided the regulation "bear[s] a reasonable relationship to the public interest sought to be protected" (*Opyt's Amoco, Inc. v. Village of South Holland*, 149 Ill. 2d 265, 269-70 (1992), citing *Crocker v. Finley*, 99 Ill. 2d 444, 456 (1984)) and is "reasonably adapted to obtain the objective intended" (*Figura v. Cummins*, 4 Ill. 2d 44, 49 (1954)). Put simply, due process prevents the state from exercising the police power in an arbitrary and unreasonable manner. *Opyt's Amoco, Inc.*, 149 Ill. 2d at 270, citing *Illinois Gamefowl Breeders Ass'n v. Block*, 75 Ill. 2d 443, 453 (1954). For example, if a statute prohibits certain activities, the prohibited activities must have a causal relationship to the harm the legislature seeks to guard against; if the activity is unrelated to the identified harm, the exercise of the police power is void. *Opyt's Amoco, Inc.*, 149 Ill. 2d at 270, citing *Pacesetter Homes, Inc. v. Village of South Holland*, 18 Ill. 2d 247, 255 (1959).

■ The legislature has expressly found that "affordable telecommunications services are essential to the health, welfare and prosperity of all Illinois citizens" (220 ILCS 5/13—102(a) (West 1994)) and that competition should be used as a substitute for traditional regulation when consistent with protecting consumers (220 ILCS 5/13—103(b) (West 1994)). Implicit in the former finding is that the absence of affordable telecommunications services would be detrimental to the public health, welfare, and prosperity. Having identified this problem and enacted section 13—506.1 as part of a comprehensive scheme to address the problem, the legislation is presumed to be a valid exercise of the police power. See *Opyt's Amoco, Inc.*, 149 Ill. 2d at 270, citing *Gamefowl Breeders Ass'n*, 75 Ill. 2d at 453. CUB asserts, without support, that the original purpose of the Act was to protect "the public from public utilities charging rates that produce excess profits." CUB argues that section 13—506.1 "subverts" this original purpose.

Assuming *arguendo* that CUB is correct about the purpose of the Act and its "subversion" by section 13—506.1, this does not render section 13—506.1 beyond the state's police power. The police power provides the authority to legislate for the public good; it does not specifically define the public good or the manner in which the legislature should act pursuant to its police power. The police power, therefore, does not mandate legislation to prevent excess profits. Even if the Act's original purpose were to prevent excess profits, this would not require all subsequent regulation of public utilities to share this purpose. Therefore, even if section 13—506.1 were an abandonment of the alleged purpose of the Act, that abandonment would not violate the police power.

Section 13—506.1 addresses valid public concerns in a reasonable manner. The legislature has identified a valid public health, morals, safety, or welfare concern. Section 13—506.1 directly addresses the question of affordability by requiring any rates set to be "fair, just, and reasonable." See 220 ILCS 5/13—506.1(b)(2) (West 1994). Additionally, for any implemented alternative regulatory plan, the Commission must (1) identify how ratepayers will benefit (see 220 ILCS 5/13—506.1(b)(5) (West 1994)); (2) ensure that the quality and availability of telecommunications services do not degrade (see 220 ILCS 5/13—506.1(b)(6) (West 1994)); and (3) ensure that no customer class will be "unduly or unreasonably" prejudiced or disadvantaged (see 220 ILCS 5/13—506.1(b)(7) (West 1994)). The foregoing provisions demonstrate that section 13—506.1 bears a more than reasonable relationship to the goal of maintaining affordable telecommunications services.

Section 13—506.1 is reasonably adapted to attain the legislature's objective. It is true that under section 13—506.1 the Commission is empowered to make almost all substantive decisions concerning an alternative regulation plan. This merely recognizes that the demands of modern society require legislative bodies to be able to delegate broad discretionary authority to administrative agencies. See *Quinn v. Donnewald*, 107 Ill. 2d 179, 188 (1985). This is the nature of the administrative state. CUB cites *Figura* to support its argument. In *Figura*, the legislature proscribed industrial processing of metal springs performed in the homes of employees. The foot press used in home processing posed the danger addressed by the legislation; the metal springs themselves were not dangerous. The supreme court held that, because the foot presses could be made safe by the addition of safety guards, it was unreasonable to eliminate categorically all home processing. *Figura*, 4 Ill. 2d at 51-52. The legislature used a sledge hammer when a tack hammer would have done the job. In the present case, the legislature has carefully adapted and tailored section 13—506.1 to secure affordable telecommunications services by using competitive mechanisms in place of ROR regulation. This has been done in a manner that, unlike *Figura*, attempts to avoid collateral effects unrelated to the legislative objective. We hold that section 13—506.1 is a permissible use of the police power.

■ Additionally, CUB argues that section 13—506.1 is an impermissibly vague delegation of authority by the legislature. A legislative delegation of discretionary authority is void if the underlying statute does not provide intelligible standards to guide the agency in the exercise of the authority. See, *e.g.*, *Balmoral Racing Club, Inc. v. Illinois Racing Board*, 151 Ill. 2d 367, 391 (1992). As a statute's

subject matter and ultimate objective become more complex, the standards promulgated to guide the agency's exercise of discretion must become more precise. *Hoogasian v. Regional Transportation Authority*, 58 Ill. 2d 117, 130 (1974). Given the highly complex nature of alternative regulation under section 13—506.1, the legislature is obligated to provide precise guidance to the Commission.

We hold that the standards set forth in section 13—506.1 are sufficiently precise to pass constitutional muster. The Act requires the Commission to consider both the public policy goals of section 13—103 (see 220 ILCS 5/13—103 (West 1994)) and the goals set forth in section 13—506.1(a) (see 220 ILCS 5/13—506.1(a)(1) through (a)(6) (West 1994)). Additionally, section 13—506.1 prohibits the Commission from approving and implementing any plan that does not, at a minimum, fulfill seven specific criteria. See 220 ILCS 5/13—506.1(b)(1) through (b)(7) (West 1994). Finally, any plan adopted must maintain basic residential service rates for three years at the level in effect 180 days before the filing of the plan. See 220 ILCS 5/13—506.1(c) (West 1994). We consider section 13—506.1(c) to be a safeguard against any plan promulgated in violation of the standards created by the legislature. The minimum three-year moratorium on rate increases ensures that the legislature has the time to amend or rescind any Commission action taken pursuant to section 13—506.1. This protects against any errors the Commission may make in applying section 13—506.1's standards.

(The material contained in Parts II through XI is unpublishable pursuant to Supreme Court Rule 23.)

### XII. CAPITAL STRUCTURE OF BELL AND AMERITECH

CUB argues the Commission failed to apply section 9—230, thereby increasing the cost of capital charged to ratepayers because of Bell's affiliation with Ameritech. Additionally, CUB contends the Commission ignored substantial evidence by refusing to modify Bell's capital structure to avoid excessive cost of capital. The former issue is one of law, the latter of fact. We address the former issue first.

CUB asserts the Commission should have used a hypothetical capital structure in determining Bell's cost of capital. Generally, equity is a more expensive form of capital than debt. *Bell Atlantic v. Public Service Comm'n*, No. 94—AA—456, slip op. at 3 (D.C. Cir. March 20, 1995); *Citizens Utility Board v. Illinois Commerce Comm'n*, 276 Ill. App. 3d 730, 743-44 (1995) (*Citizens Utility Board II*). Therefore, the more equity in a utility's capital structure, the higher the ROR must be to cover the cost of capital. *Citizens Utility Board II*, 276 Ill. App. 3d at 744. CUB asserts that Bell's capital structure

contains too much equity and not enough debt. As a result, CUB argues, the Commission should have ignored Bell's actual capital structure and promulgated a hypothetical structure containing a reasonable mix of debt and equity. See *Potomac Edison Co. v. Public Service Comm'n*, 279 Md. 573, 580, 369 A.2d 1035, 1040 (1977), citing 1 A. Priest, Principles of Public Utility Regulation 214 (1969) ("It is appropriate to consider the underlying capital structure of the system in any parent-subsidiary situation"); see also Annotation, *Propriety of Considering Capital Structure of Utility's Parent Company or Subsidiary in Setting Utility's Rate of Return*, 80 A.L.R.4th 280, 305-09 (1990) (collecting cases).

The Commission counters that its use of Bell's actual capital structure was lawful. The Commission's order states several times that the use of Bell's actual capital structure is "reasonable." The Commission argues that its determination of reasonableness is supported by substantial evidence. Further, the Commission contends it has previously held "that a hypothetical capital structure should only be used 'when the utility's actual capital structure is found to be unreasonable, imprudent or unduly affected by such circumstances as double leverage as so to unfairly burden the utility's customers.' " *People ex rel. Hartigan III*, 214 Ill. App. 3d at 228.

The Commission begs the threshold questions implicit in CUB's arguments: (1) what is the Commission's obligation in applying section 9—230; and (2) did the Commission meet that obligation? Section 9—230 provides:

> "In determining a reasonable rate of return upon investment for any public utility in any proceeding to establish rates or charges, the Commission shall not include *any* incremental risk or increased cost of capital which is the *direct or indirect* result of the public utility's affiliation with unregulated or nonutility companies." (Emphasis added.) 220 ILCS 5/9—230 (West 1994).

Section 9—230 has been construed on two other occasions. See *Citizens Utility Board II*, 276 Ill. App. 3d at 745-47; *Central Illinois*, 243 Ill. App. 3d at 440-44. In *Central Illinois*, the intervenors claimed the Commission violated section 9—230 by allowing Central Illinois Public Service Company (CIPS) to include temporary cash investments (TCIs) in its capital structure. The intervenors argued that the TCIs "were not being used by CIPS to fund regulated, utility operations, but were short-term investments accumulated for transfer to CIPSCO, CIPS' nonregulated parent company." *Central Illinois*, 243 Ill. App. 3d at 442. The court rejected this argument because the Commission, which claimed its decision was "supported by evidence that inclusion of the TCIs *has no impact* on CIPS' cost of capital"

(emphasis added) (*Central Illinois*, 243 Ill. App. 3d at 443), had provided sufficient evidence and findings to support its conclusion (*Central Illinois*, 243 Ill. App. 3d at 444).

*Citizens Utility Board II* involved a Commission order granting Central Illinois Telephone Company of Illinois (Centel) permission to both restructure its rates and increase its total revenues. Centel was a subsidiary of Sprint. On appeal, CUB argued "Sprint's consolidated capital statement shows that Centel's capital structure included inflated equity, leading to an unreasonable cost of capital used to support Sprint's less stable, unregulated subsidiaries." *Citizens Utility Board II*, 276 Ill. App. 3d at 745. In *Citizens Utility Board II*, as in the present case, the Commission expressly found the utility's proposed capital structure " 'reasonable' " and the evidence insufficient to " 'support a finding that [the regulated utility's] capital structure [had] been manipulated.' " *Citizens Utility Board II*, 276 Ill. App. 3d at 746. In rejecting the Commission's finding as insufficient, the appellate court stated:

> "The utility bears the burden of proving that its proposed rates are just and reasonable. (220 ILCS 5/9—201(c) (West 1992).) To prove this the utility must prove the reasonableness of the values it places on the components of the revenue requirement. Thus, the utility must show that its operating costs are reasonable, its rate base is the reasonable value of its property used for serving the public, and its [ROR] on capital is the reasonable cost of the capital needed to provide the services." *Citizens Utility Board II*, 276 Ill. App. 3d at 746.

The Commission's capital structure approval was based primarily on CUB's failure to demonstrate capital structure manipulation under section 9—230. *Citizens Utility Board II*, 276 Ill. App. 3d at 747. On remand, therefore, the court directed the Commission to consider (1) whether the reported capital structure allowed Sprint to use Centel's earnings to subsidize risky operations; and (2) whether Centel's studies demonstrated that the reported capital structure and the attendant ROR were reasonably necessary for the provision of services. *Citizens Utility Board II*, 276 Ill. App. 3d at 747.

■ Before deciding whether to use a hypothetical capital structure, the Commission was required to determine whether either Bell's risk or cost of capital was increased because of its affiliation with Ameritech. When determining the meaning of a statute, the goal of the court is to give effect to the legislature's intent. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 207 (1991) (*Business & Professional People III*). Statutory language is the primary source for determining that

intent. *Business & Professional People III*, 146 Ill. 2d at 207. In section 9—230, the legislature used the word "any" to modify its prohibition of considering incremental risk or increased cost of capital in determining a reasonable ROR. This usage removes all discretion from the Commission. Section 9—230 does not allow the Commission to consider what portion of a utility's increased risk or cost of capital caused by affiliation is "reasonable" and therefore should be borne by the utility's ratepayers; the legislature has determined that any increase whatsoever must be excluded from the ROR determination. It is impermissible for the Commission to substitute its reasonableness standard for the legislature's absolute standard. The Commission may not define a portion of the Act in a way that conflicts with a specific directive contained in the Act. *Illinois Bell Telephone Co. I*, 203 Ill. App. 3d at 442. We hold that if a utility's exposure to risk is one iota greater, or it pays one dollar more for capital because of its affiliation with an unregulated or nonutility company, the Commission must take steps to ensure that such increases do not enter in its ROR calculation.

We reverse and remand the Commission's order. The Commission applied an incorrect construction of section 9—230 and, in so doing, failed to apply the section at all. Rather than determining whether Bell's risk or capital costs were greater because of its affiliation with Ameritech, the Commission merely determined Bell's capital structure was reasonable. As a result, the Commission has also failed to make a finding of fact upon a principal issue.

Our holding is consistent with the *Central Illinois* decision. *Central Illinois* affirmed a Commission order expressly finding that the regulated utility's cost of capital was unaffected by its unregulated parent. *Central Illinois*, 243 Ill. App. 3d at 443. The Commission in *Central Illinois*, therefore, applied the correct standard under section 9—230.

Additionally, our holding builds upon the *Citizens Utility Board II* decision. By definition, reasonable rates exclude any incremental risk or increased cost of capital resulting from a utility's affiliation with its parent. See 220 ILCS 5/9—230 (West 1994). However, the mere absence of incremental risk or increased cost of capital due to affiliation does not, by itself, yield just and reasonable rates. See *Citizens Utilities Co.*, 124 Ill. 2d at 200-01 (revenue requirement calculation takes into account operating expenses as well as the cost of capital). Put another way, all reasonable rates exclude any incremental risk or increased cost of capital due to affiliation; however, the simple exclusion of such risk or cost does not, *a fortiori*, make rates reasonable. As in *Citizens Utility Board II*, we cannot al-

low the failure by an intervenor to demonstrate manipulation to relieve the utility of its responsibility to prove that its rates are just and reasonable. When read together then, sections 9—201(c) and 9—230 require the Commission to find that (1) proposed rates—including going-in rates under section 13—506.1—are just and reasonable, and (2) all incremental risk or increased cost of capital due to affiliation have been excluded from such rates. In the present case, as in *Citizens Utility Board II*, the Commission impermissibly substituted the former finding for the latter. The Act requires both findings.

■ We next consider whether the Commission ignored substantial evidence by refusing to modify Bell's capital structure to avoid excessive cost of capital. Specifically, CUB argues the Commission ignored the evidence presented by CUB witness James Rothschild and AG witness Stephen G. Hill in finding Bell's actual capital structure was reasonable. CUB's argument echoes Bell's contention—discussed in part III of the discussion—concerning the Commission's alleged refusal to consider relevant evidence in determining Bell's fair ROE. In its order the Commission discussed and discounted the testimony of both Rothschild and Hill. The Commission instead relied on the evidence presented by staff witness Jon Summerville and Bell witness Phillips. We, therefore, dispense with CUB's argument summarily and for the same reasons identified in part III of this discussion. See *People ex rel. Hartigan III*, 214 Ill. App. 3d at 229; *United Cities Gas Co. v. Illinois Commerce Comm'n*, 48 Ill. 2d 36, 40 (1971). We hold the Commission did not ignore substantial evidence in finding the use of Bell's actual capital structure reasonable.

The distinction between (1) a refusal by the Commission to consider substantial evidence in making a factual finding; and (2) whether that finding is supported by substantial evidence appears—at first blush—to be a question of semantics. It is not. The first issue concerns whether the Commission considered all the relevant evidence before making its finding; assuming the Commission did so, the second issue concerns whether the portion of that evidence supporting the Commission's finding is substantial.

■ CUB does not argue the Commission's determination concerning Bell's actual capital structure is not supported by substantial evidence. However, we choose to address this issue in light of our holding the Commission failed to apply section 9—230. It is true the section 9—230 analysis is separate from whether the utility's cost of capital—*i.e.*, the capital structure as represented by the debt to equity ratio—is just and reasonable as a value used in calculating the revenue requirement. See *Citizens Utility Board II*, 276 Ill. App. 3d at

746. However, although section 9—230 and the justness and reasonableness of the capital structure present distinct questions, the result of the former analysis may have implications for the latter. Assuming section 9—230 has not been violated, a utility's capital structure may still be unjust and unreasonable for reasons other than the utility's affiliation with an unregulated or nonutility company. By contrast, a determination the utility has an affiliation-based increased cost of capital precludes a finding that the actual capital structure is just and reasonable. See 220 ILCS 5/9—230 (West 1994) (providing that a "reasonable rate of return upon investment *** shall not include any *** increased cost of capital").

The Commission relied on the testimony of Summerville and Phillips in finding Bell's actual capital structure reasonable. Phillips provided three rationales supporting the reasonableness of the actual capital structure. First, he testified Bell's capital structure was consistent with those of comparable telecommunications companies. Phillips determined this by comparing Bell's equity against the average equity ratio of four independent telecommunications companies and seven holding companies. He asserted this "proxy group" all "confront comparable risks to *** Bell." The comparability of Bell to the proxy group was based on a favorable comparison of each company's (1) Value Line "beta" coefficient; (2) Value Line "safety" rating; and (3) Standard & Poor's bond rating. Second, Phillips stated Bell's actual capital structure was consistent with Standard & Poor's 1992 telephone financial guidelines. Moreover, he contended the hypothetical capital structures proposed by Rothschild and Hill would be contrary to industry rating trends. As a result, Phillips argued, Bell's financial integrity would be seriously weakened. Third, he asserted, because the capital structure had been reviewed without question in prior proceedings, it would be unsettling to investors if the Commission determined its prior findings had been in error.

Summerville concurred with Phillips' conclusion that Bell's actual capital structure should be used. He testified Bell's actual capital structure was appropriate because it results in reasonable rates. In reaching this conclusion, Summerville took into account Bell's (1) embedded cost of long-term debt; (2) short-term debt rate; (3) equity ratio compared to Value Line's projected equity ratio for the telecommunications industry; (4) equity ratio compared to Standard & Poor's risk-adjusted criteria—which are used to determine a utility's bond rating—for various domestic utilities; and (5) standing vis-a-vis 40 market-traded telecommunications companies comprising a computer database of "publicly held telephone companies traded on the major stock exchanges."

Based on the preceding, we hold that the Commission's finding that Bell's actual capital structure is reasonable is supported by substantial evidence. In reaching this conclusion, we are mindful of our limited role in reviewing the Commission's factual findings. However, we also hold this conclusion is valid on remand only if the Commission finds there has been no incremental risk or increased cost of capital caused by affiliation with Ameritech.

We provide these directions on remand. First, the Commission must determine if Bell is burdened with any incremental risk or increased cost of capital because of its affiliation with Ameritech. It is not our place to dictate to the Commission how this should be done (see *People ex rel. Hartigan I*, 117 Ill. 2d at 142); it must, however, be done (see *People ex rel. O'Malley*, 239 Ill. App. 3d at 382 (stating that the court's role in construing the Act was to determine "*what* the Commission was required to do but not *how* the Commission was to do it") (emphasis in original)).

Second, a finding that Bell's capital structure has not been consciously manipulated, with nothing more, will not satisfy section 9—230's requirements. See *Citizens Utility Board II*, 276 Ill. App. 3d at 746-47. We hold that the legislature's use of the phrase "direct or indirect" (220 ILCS 5/9—230 (West 1994)) evinces an intent to prohibit the inclusion of both intended and unintended incremental risk or increased capital cost in utility rates. This holding is consistent with the Act's often expressed policy of ensuring ratepayers bear only the cost of the service they purchase. See 220 ILCS 5/1—102, 7—101(2), 7—101(3), 7—102(f), 7—203, 9—230, 13—507 (West 1994). Therefore, whatever methodology the Commission adopts on remand must determine whether Bell's affiliation with Ameritech has in any way, regardless of the mental state of the actors involved, caused Bell's risk or capital costs to increase.

Third, if Bell's incremental risk or cost of capital has increased because of its affiliation with Ameritech, the Commission must determine the amount of this increase. Any increase then must be removed from the calculation of Bell's ROR.

Fourth, the Commission will receive any additional argument the parties wish to submit on the issues we have outlined under section 9—230. Also, the Commission—after hearing the parties' arguments concerning the need for additional evidence—will determine whether such evidence is required to make the necessary findings under section 9—230. See *People ex rel. Hartigan I*, 117 Ill. 2d at 142 (court may direct the Commission to receive new evidence on remand). These steps are needed because the Commission has used an incorrect legal standard in applying section 9—230. All submissions will

be strictly limited to the issues arising under section 9—230, unless otherwise authorized by the Commission.

Fifth, in the event the Commission determines section 9—230 has been violated, the Commission will accept additional argument and evidence on whether Bell's actual capital structure is reasonable. The parties may submit additional evidence pertinent to the reasonableness of the capital structure only if the Commission finds an incremental risk or increased cost of capital caused by affiliation. We believe a violation of section 9—230 does not, *per se*, require the adoption of a hypothetical capital structure. For example, the Commission might choose to ameliorate any increased capital costs through imputation rather than by adopting a hypothetical capital structure. However, we do believe a finding of incremental risk or increased cost of capital caused by affiliation would so undermine the validity of the Commission's fact-finding process as to require reopening the question of the reasonableness of Bell's actual capital structure.

## CONCLUSION

Because of the errors identified in part XII of our discussion, we reverse the Commission's order. The cause is remanded for further proceedings consistent with this opinion and the directions set forth at the conclusion of part XII of the discussion.

Although we have found no error in any other portion of the Commission's order, we must reverse the entire order. Under section 10—201(e)(ii), when remanding only a portion of a Commission order, we are obligated to "determine without delay the lawfulness and reasonableness of any independent portions of the *** order or decision subject to appeal." 220 ILCS 5/10—201(e)(ii) (West 1994). We find that the alternative regulatory plan adopted in the present case is a complex and inextricably interrelated fabric. Tugging at one end of the plan might unravel the entire plan. Without knowing the disposition of the capital structure issues discussed in part XII, any finding concerning the lawfulness or reasonableness of the remainder of the order would be arbitrary. We, therefore, must reverse the order *in toto*. See *Illinois Bell Telephone Co. I*, 203 Ill. App. 3d at 442 (when reversing a portion of a Commission order that is "inextricably linked" to the rest of the order, the order must be reversed *in toto*).

Our opinion does not give the parties *carte blanche* to relitigate all the issues previously decided. We emphasize the parties may only submit additional argument on issues other than those arising under section 9—230 with the leave of the Commission. The parties may not submit new evidence on any issue without leave of the Commis-

sion. If the Commission determines neither Bell's incremental risk nor cost of capital has increased because of the Ameritech affiliation, the other issues will be moot. If the Commission finds Bell's affiliation has increased incremental risk or capital cost, the Commission will (1) permit the parties to submit additional evidence and argument on the reasonableness of Bell's actual capital structure; and (2) after hearing the parties' arguments, will determine to what extent—if any—other issues must be reopened.

For the foregoing reasons, the order of the Illinois Commerce Commission is reversed, and the cause is remanded with directions.

Reversed and remanded with directions.

DOYLE and RATHJE, JJ., concur.